OMNIPOINT COMMUNICATIONS
ENTERPRISES, L.P.,

v.

ZONING HEARING BOARD
OF EASTTOWN TWP.

CIVIL ACTION NO. 99–2080.

United States District Court,
E.D. Pennsylvania.

April 1, 2002.

---

James C. Dalton, Christopher H. Schubert, Riley, Riper, Hollin & Colagreco, Paoli, PA, for Omnipoint Communications Enterprises, L.P.

Andrew D.H. Rau, Gawthrop, Greenwood and Halsted, West Chester, PA, Paola F. Tripodi, Holsten & White, Media, PA, John S. Halsted, Gawthrop, Greenwood & Halsted, P.C., West Chester, PA, Jennifer L. Holsten, Holsten and Associates, Media, PA, for Zoning Hearing Bd. of Eastton Tp.

### OPINION AND JUDGMENT ORDER [1]

HART, United States Magistrate Judge.

Omnipoint, a subsidiary of VoiceStream Wireless, brought this suit alleging that the decision of Easttown Township's Zoning Hearing Board ("ZHB") denying it a permit to construct a telecommunications tower violated the Telecommunications Act, ("TCA"). In addition, Omnipoint challenges the zoning ordinance as exclusionary under the Pennsylvania Constitution. After consideration of the entire record judgment will be entered in favor of the Defendant. This Opinion and Order shall constitute the Court's findings of fact and conclusions of law.

### Facts and Procedural History

On July 30, 1998, Omnipoint filed an application with the ZHB, seeking a Use Variance to erect a Personal Communication Service ("PCS") tower on property owned by Or Shalom Synagogue in Easttown Township at 835 Darby Paoli Road. In the alternative, Omnipoint challenged the validity of the township's zoning ordinance under the Pennsylvania Constitution and the TCA. The proposed facility would be a 110 foot stealth flagpole design, 24 inches in diameter at the base and 16 inches at the top. The telecommunications antennae would be contained inside the fiberglass flagpole structure. After holding three hearings on the application, the ZHB denied Omnipoint's application on March 17, 1999, finding, among other things, that Omnipoint had failed to establish a "hole" in service. (Findings, Memorandum, and Order, of the ZHB, 3/17/99, at 9).

Omnipoint sought review in the District Court.[2] On November 2, 1999, the Honorable Marvin Katz granted Omnipoint's mo-

---

[1]. Appended to this Opinion is a rhyming synopsis of the Telecommunications Act claim. With apologies to Ernest L. Thayer, the author of "Casey at the Bat," my law clerk, Anna Marie Plum, and I adapted the poem to address this issue.

[2]. In the federal suit, Omnipoint did not challenge the ZHB's decision denying the use variance.

tion for summary judgment, in part, and ordered the Defendant to grant the Plaintiff's application, permitting the installation of the stealth flagpole telecommunications facility. On appeal, the Third Circuit found that Judge Katz did not have the benefit of the Circuit Court's decision in *APT Pittsburgh Limited Partnership v. Penn Township*, 196 F.3d 469 (3d Cir. 1999). The court, therefore, remanded the case for further development of the record and reconsideration in light of the *Penn Township* decision.

On remand, the parties consented to have the case proceed before a United States Magistrate Judge and Judge Katz referred the case to me for all further proceedings. The parties supplemented the record with expert reports regarding the quality and level of wireless service in the area and I heard testimony on January 31, and February 1, 2002.

### TCA Claim

■ In Count I of Omnipoint's Complaint, it contends that the ZHB's decision violates the TCA because the zoning ordinance "prohibit[s] or [has] the effect of prohibiting the provision of personal wireless service." 47 U.S.C. § 332(c)(7)(B)(i)(II). In order for the Plaintiff to establish a violation of this section of the TCA, the Third Circuit has determined that the service provider must establish (1) that there is a significant gap in cellular coverage; and (2) that the provider proposes to fill the gap in the least intrusive way.

> First, the provider must show that its facility will fill an existing significant gap in the ability of remote users to access the national telephone network.... Second, the provider applicant must also show that the manner in which it proposes to fill the significant gap in service is the least intrusive on

the values that the denial sought to serve.

*Penn Township*, 196 F.3d at 480. *See also Nextel West Corp. v. Unity Township*, 282 F.3d 257 (3d Cir.2002). We will proceed to address these requirements in reverse order.

In discussing the manner in which the provider seeks to fill the gap, the Third Circuit has held that the provider must investigate alternatives.

> This will require a showing that a good faith effort has been made to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc.

*Penn Township*, 196 F.3d at 480.

■ Omnipoint argues that the stealth flagpole on the Synagogue site is the least intrusive means to fill the gap in cellular coverage. The township disagrees and contends that Omnipoint has failed to establish that it conducted a sufficient inquiry to determine whether its proposal is the least intrusive. Based on the evidence presented to the ZHB and the testimony presented at trial, we believe Omnipoint properly determined that the stealth flagpole is the least intrusive of all the alternatives.

At trial, Omnipoint presented the testimony of Eric Goldberg, the Manager of Engineering for VoiceStream Wireless. Mr. Goldberg described Omnipoint's efforts in investigating alternative sites for the telecommunications facility. The owners of a horse farm catercorner to the Synagogue site were not interested in leasing property to Omnipoint. In any event, the zoning issues in the residential area where the horse farm is located would be the same as those faced by Omnipoint in proposing to build a cell site on the Syna-

gogue property. (N.T. 1/31/02, 26). A PECo substation south of the Synagogue site was also unsuitable, due to a pending suit between PECo and Omnipoint. In addition, any telecommunications facility placed at the PECo substation would require a use variance, similar to the one Omnipoint sought for the Synagogue site. (N.T. 1/31/02, 27–28).

Mr. Goldberg also discussed the possibility of using the existing telephone poles along Route 252. However, these poles are owned by PECo, and each pole so used would also require an easement or lease with the land owner for the equipment that would be located on the ground. (N.T. 1/31/02, 29). Moreover, at the ZHB hearings, Edmond Vea, a radio-frequency engineer, (RF engineer), contracting with Omnipoint, discussed the problem with using repeaters, signal amplifiers, along the Route 252 corridor. Unfortunately, Mr. Vea explained that this would resolve only small coverage holes and would require a tower of at least 80 feet. (N.T. 9/16/98, 84). Finally, James Miller, AICP, PP, a land planner, explained that building a tower in the business district would not eliminate Omnipoint's coverage gap because the closest business district is over two miles away. (N.T. 1/31/02, 198–200).

In addition to presenting evidence to establish its inability to construct a tower elsewhere or provide service in an alternative manner, Omnipoint also presented evidence supporting its choice to build the stealth flagpole on the Synagogue site. First, Mr. Miller testified that, although located in a residential zone, the Synagogue property was an institutional use. He explained that institutional use properties are "generally a good choice because they tend to be larger properties and they have the size to accommodate the structure without infringing on neighboring uses." (N.T. 1/31/02, 220). Similarly, at the ZHB hearings, R. Douglas Stewart, a land planner, and Anton Dell'Orefice, a site locator, discussed the benefits of using the Synagogue property, including the fact that there is a mature tree line around the property. (N.T. 1/11/99, 275–81; 9/16/98, 13–18).

As for the proposed structure, Mr. Miller concluded that the stealth flagpole was the least intrusive means of providing wireless coverage to the area. (N.T. 1/31/02, 202). After reviewing photographs of other designs, including the monopole antenna on the Berwyn Fire Company, a lattice antenna structure, the artificial tree that has us all wondering about the vegetation in the Willow Grove area, and finally a giant steel cross on the property of St. Gabriel's Church,[3] the Court agrees. Therefore, we are satisfied that Omnipoint's proposal is the least intrusive.

■ We now switch our focus to the first prong of the *Penn Township* test-the burden of proving "a significant gap in the ability of remote users to access the national telephone network." *Penn Township*, 196 F.3d at 480. This inquiry does not hinge on a gap in the service provided by one communications company. Rather, the focus of the inquiry must be on the service available to all remote users in the specific area. *Id.* It requires a "gap from the *user's* perspective, rather than a *particular provider's* perspective." *Nextel*, at 265.

■ In an attempt to establish a "significant gap" in service in the relevant area of Easttown Township, Omnipoint presented

---

3. The Court takes judicial notice that a stealth cross antenna would be an inappropriate lawn ornament for the Or Shalom Synagogue.

the expert report and testimony of Paul Dugan, P.E., an RF engineer. Using testing equipment linking eight cellular phones to a laptop computer, Mr. Dugan conducted a mobile "baseline test," measuring signal strength and performance for each of the cellular providers in Easttown Township. (N.T. 1/31/02, 76–77, 79). A vehicle containing all of the equipment was driven throughout the township during a Friday rush hour and the computer initiated calls every 150 seconds. (N.T. 1/31/02, 81). The data was then plotted on several charts which Mr. Dugan described for the court.

Based on the results of this "baseline test," Mr. Dugan concluded that "a coverage hole currently exists for all licensees that is centered near Omnipoint's proposed communication facility." (Report of Dugan, at 3). In support of his conclusion, Mr. Dugan presented the court with the eight charts generated by plotting the computer-collected data. Each chart depicted the signal strength and performance of a different cellular provider-Cingular (analog); Cingular (digital); Verizon (analog); Verizon (digital); Nextel; AT & T; Sprint; and VoiceStream. (N.T. 1/31/02, 75). In Mr. Dugan's opinion, signal strength is the prerequisite to providing reliable wireless service, and a negative 85 dbm was the minimum signal strength necessary for reliable service. (N.T. 1/31/02, 90, 94). The signal strength depicted in the charts, therefore, is based on the negative 85 dbm standard, blue depicting negative 85 dbm or greater (denoting reliable service) and red depicting less than negative 85 dbm (unreliable service). Based on Mr. Dugan's standard, seven of the eight telephone providers show substantial areas of unreliable service.

The Court, however, finds several flaws in Mr. Dugan's assessment. First, Mr. Dugan failed to identify any regulatory standard requiring negative 85 dbm. (N.T. 1/31/02, 173). Instead, Mr. Dugan simply opined that based on his experience, a negative 85 dbm or greater signal strength is necessary to provide reliable service.

■ Mr. Dugan defined reliable service as the ability of a user to place a wireless call or access the national telephone network. (N.T. 1/31/02, 173). Unfortunately, Mr. Dugan failed to establish a correlation between the negative 85 dbm standard and the actual ability of users to access the national telephone network. To the contrary, Mr. Dugan's own charts showed that most of the calls were initiated successfully, even when the signal strength was below negative 85 dbm. In fact, some of the dropped calls were in areas with allegedly reliable service. (Plaintiff's Exhibit 2, C, D). Like the engineering of a bumble bee, Mr. Dugan said it can't fly, yet his own tests revealed that cellphone users in the area can make and receive calls. Although Mr. Dugan explained that he would expect to lose a large number of calls in the heart of the coverage hole if he drove there for an extended period of time, (N.T. 1/31/02, 102), we note that the burden is on the Plaintiff to establish a significant gap in coverage. Mr. Dugan's expectations, notwithstanding, the evidence presented to this court fails to establish that signal strength of less than negative 85 dbm results in the inability of the remote user to access the national telephone network.[4]

---

4. The Court is also unimpressed with Mr. Dugan's repeated admonition that the results were more favorable than the average customer would experience because each of the phones was connected to a roof-mounted antenna on the test vehicle. (N.T. 1/31/02, 78–79, 83, 110, 111, 115, 117). Mr. Dugan failed to establish what amount of signal deterioration would be attributable to the normal usage of a cellphone rather than having it at-

Moreover, Mr. Dugan's test results actually support the reliability benchmark set by Plaintiff's own experts. Mr. Vea testified for Omnipoint before the ZHB. He said that a 98% call completion rate is the "limit of the industry standard." (ZHB Hearing Notes, 9/16/98, 76). Mr. Dugan testified that each phone made approximately eighty phone calls during his test drive for a total of 640 calls total. (N.T. 1/31/02, 89). He then drew our attention to the number of dropped calls, and instances where there was no service.[5] Reviewing the charts for the seven service providers, other than Omnipoint, we see only 10 dropped calls and one instance of no service. (Plaintiff's Exhibit 2, A E). Therefore, of the 560 calls made utilizing the other providers' services, only 11 or 1.96% experienced service problems. Omnipoint, on the other hand, had 11 dropped calls and 13 instances of no service. (Plaintiff's Exhibit 2, F). Using Mr. Dugan's figure of 80 calls attempted, Omnipoint had service related problems 30% of the time.

As a result, rather than establishing a significant gap overall, Mr. Dugan's analysis proved that only one provider, Omnipoint, was incapable of providing reliable service to its customers. Such a showing does not satisfy the *Penn Township* burden. "[I]t is necessary for the provider to show more than that it was denied an opportunity to fill a gap in its service system." *Penn Township*, 196 F.3d at 480. Having failed to establish a significant gap, Omnipoint has failed to prove the ZHB's denial of the variance had the effect of prohibiting the provision of wireless service.

### *Exclusionary Zoning*

■ Omnipoint next claims that the zoning ordinance is exclusionary. The state courts and the Third Circuit have repeatedly stated that Pennsylvania law presumes the validity of zoning ordinances. *Penn Township*, 196 F.3d at 475; *Sprint Spectrum, L.P. v. Zoning Hearing Board of Mahoning Township*, 46 Pa.D. & C.4th 187, 191 (Pa.Com.Pl.2000)(citing *Sullivan v. Board of Supervisors of Lower Makefield Twp.*, 22 Pa.Cmwlth. 318, 348 A.2d 464 (1975)). In order to sustain its burden, the plaintiff must show that the ordinance totally excludes a particular use. *Penn Township*, 196 F.3d at 475; *Sprint Spectrum*, 46 Pa.D. & C. at 192.

■ In pressing its exclusionary zoning claim, Omnipoint argues that Easttown Township's zoning ordinance is exclusionary both *de jure* and *de facto*. *De jure* exclusion occurs when an "ordinance, on its face, totally bans a legitimate use." *Penn Township*, 196 F.3d at 475 (quoting *Farrell v. Worcester Twp. Bd. of Supervisors*, 85 Pa.Cmwlth. 163, 481 A.2d 986, 989 (1984)). *De facto* exclusion exists "where an ordinance permits a use on its face, but when applied acts to prohibit the use throughout the municipality." *Id.*

### 1. *De Jure Exclusion*

■ In support of its claim of *de jure* exclusion, Omnipoint argues that the zoning ordinance in effect at the time of its

---

tached to an antenna on the roof. Again, we note that the burden is on the plaintiff to prove a coverage gap. If Omnipoint realized that Mr. Dugan's roof antennae were producing better than average reception, it was up to the plaintiff to correct this proof problem by more closely replicating actual driving habits and equipment.

**5.** Mr. Dugan explained that "fast busy" and "reorder" are functions of capacity, in essence, too many people using their phones at the same time. (N.T. 1/31/02, 101–02). "Connect time out" occurs for any number of reasons when the cellphone cannot connect to the national network properly. (N.T. 1/31/02, 101).

variance application did not make any provision for telecommunications towers. The township, on the other hand, contends that telecommunications towers are permitted by special exception in the B Business District pursuant to the catch-all provision of § 1101.16.

Section 1101.16 provides:

*USE REGULATIONS.* A detached or semi-detached building may be erected or used and a lot may be used or occupied for any use permitted in any other District and for the following purposes and no other:

.　　　.　　　.　　　.　　　.

16. Any use of the same general character as those enumerated above when authorized as a Special Exception by the Zoning Hearing Board, provided the Zoning Hearing Board shall find:

a. That the proposed use is of the same general character.

b. That the proposed use would cause no undue traffic congestion nor result in the emanation of heat, glare, noise, noxious odors or any other nuisance on or off the premises.

Easttown Township Ordinance 160–80 (rev.8/30/85), § 1101.16.

At trial, Omnipoint contended that a telecommunications use was not of the same general character as any of the enumerated uses in § 1101. (N.T. 2/1/02, 6). Therefore, construction of a telecommunications tower did not fall into Subsection 16 of § 1101, commonly referred to as the catch-all provision. Omnipoint presented the testimony of James Miller, a land planner. Mr. Miller testified that, based upon his reading of the ordinance in existence at the time of Omnipoint's variance request, wireless communications facilities were not a permitted use anywhere in Easttown Township. (N.T. 1/31/02, 184–85). Mr. Miller explained that the catch-all provi-

sion required a use of the same general character as that of one of the fifteen enumerated uses. (N.T. 1/31/02, 187–88). He then reviewed each of the fifteen enumerated uses and explained why a telecommunications facility did not fall into any of them. (N.T. 1/31/02, 188–91).

In response, the township called Gene Williams, Easttown Township's Manager and Zoning Officer. As zoning officer, Mr. Williams included among his duties the enforcement of Easttown's zoning ordinance. (N.T. 2/1/02, 9). Mr. Williams disagreed with Mr. Miller's construction of the catch-all provision to prohibit telecommunications facilities. (N.T. 2/1/02, 27). He directed the court to the ZHB's action in 1990, granting an application for a variance by the Berwyn Fire Company to erect a 120 foot tower, and to Metrophone's later request for a special exception to install an antenna on the same tower. Mr. Williams explained that the only provision under which Metrophone could have proceeded, and the special exception could have been granted, was the catch-all provision of § 1101.16. (N.T. 2/1/02, 16).

Similarly, Mr. Williams reviewed the ZHB's action on a 1995 variance and special exception request by the Berwyn Fire Company and Bell Atlantic. The fire company sought to replace the 120 foot tower with a 140 foot tower and Bell Atlantic sought to place an antenna on the structure. In its moving papers, counsel identified Bell Atlantic's request as falling within the personal service provision of § 1101.7 of the zoning ordinance, or the catch-all provision. (N.T. 2/1/02, 24). In approving the variance and special exception, the ZHB found that the proposed tower constituted a special exception under the zoning ordinance. Moreover, in denying Omnipoint's variance request, the ZHB acknowledged that it has interpreted

the ordinance to permit telecommunications towers in the B Business district. (Findings, Memorandum, and Order, Zoning Hearing Board of Easttown Township, Mar. 17, 1999, at ¶ 22).

■ From this evidence, it is clear to the court that the ZHB construes the catch-all provision to allow telecommunications facilities, a fact we must consider in determining whether the ordinance is exclusionary. *See Sprint Spectrum,* 46 Pa. D. & C.4th at 192 ("A zoning hearing board's interpretation of its own municipality's zoning ordinance is entitled to weight because it reflects the construction of a statute by an agency charged with its executions and application.... This is particularly true where the board's interpretation ... is a permissive one rather than a restrictive one.").

In considering Omnipoint's exclusion, *de jure* claim, we are guided by the opinion of the Honorable D. Brooks Smith in *APT Pittsburgh Limited Partnership v. Lower Yoder Township, Cambria County,* 111 F.Supp.2d 664, 670 (W.D.Pa.2000).

> Simply because an ordinance does not expressly permit a use does not mean that it prohibits that use. If localities were required to detail in their zoning ordinances every possible land use, they would have time to do little else. It is difficult enough for experts in the telecommunications industry to keep up with the changes in the industry, where technology has changed so rapidly in a few short years. Requiring local zoning officers to do the same—and to assure that these changes are enshrined in local

ordinances—is asking for more than the TCA requires.

*Id.*

Although Judge Smith was reviewing a prohibition under the TCA, we believe his reasoning is equally applicable to an exclusionary zoning claim. While Easttown's zoning ordinance does not explicitly provide for telecommunications facilities, it is clear that the ZHB has considered the B Business district to permit such a use. We find, therefore, that the ordinance does not exclude telecommunications facilities on its face.[6]

## 2. De Facto Exclusion

■ Even though we have found that Easttown's zoning ordinance is not *de jure* exclusionary, it may still be considered exclusionary if, when applied, it prohibits a use throughout the municipality. *Penn Township,* 196 F.3d at 475 (citing *Farrell,* 481 A.2d at 989). On this point, Omnipoint urges that the height restrictions contained in the zoning ordinance effectively prohibit the establishment of functional telecommunication facilities in the township.

The regulations in effect at the time of Omnipoint's variance request contained a 35 foot height restriction for residential areas and a 50 foot height restriction in the Business Districts. Easttown Township Ordinance 160–80 (rev.8/30/85), §§ 303, 1102(4). Mr. Miller explained that the foliage and topography of the area would render an antenna at 50 feet ineffective. (N.T. 1/31/02, 195–96). Easttown Township provided no contrary evidence.

---

**6.** With the advent of "enhanced 911," (N.T. 1/31/02, 19), as discussed by Eric Goldberg, the Manager of Engineering for VoiceStream, it is possible that an argument could be made that the telecommunications use falls into the municipal use provided for by § 1101.3. Neither side considered this possibility in its submissions and we do not believe that sufficient evidence was presented concerning the FCC's requirements to fully assess such an argument.

The problem with Omnipoint's argument, however, is that height variances for communications facilities are given by the ZHB. The Third Circuit made it clear that in order to be considered exclusionary, the zoning ordinance must exclude the construction of telecommunications facilities altogether.

> In order to overcome the presumption of [the zoning ordinance's] constitutionality, [the Plaintiff] must show that the ordinance "effectively excludes the construction of any communications towers throughout the Township." *Penn Township*, 196 F.3d at 476. In other words, to succeed on its exclusionary zoning claim, [the Plaintiff] must prove that "no telecommunications provider, including itself, could build a functional tower" in the [Township]. *Id.* at 476.

*Lower Yoder*, 111 F.Supp.2d 664, 679. In this case, the ZHB previously granted height variances for the erection of two telecommunications towers on the Berwyn Fire Company. In 1990, a variance was granted to allow a 120 foot tower and colocation by Metrophone, and in 1995, the variance allowed a 140 foot tower and colocation by Bell Atlantic. Again, the Court is reminded of the engineering of a bumble bee. Omnipoint argues that the zoning ordinance forecloses the construction of telecommunications towers. Yet, there sits one larger than life, square atop the Berwyn Fire Station in the middle of downtown Easttown.

We are unpersuaded by the Plaintiff's reliance on *Girsh Appeal*, 437 Pa. 237, 263 A.2d 395 (1970). In *Girsh*, the Pennsylvania Supreme Court found a zoning ordinance in Nether Providence Township unconstitutional because it made no provision for apartments except by variance. The Honorable Samuel J. Roberts explained:

> It is settled law that a variance is available only on narrow grounds, i.e., where the property is subjected to an unnecessary hardship, unique or peculiar to itself, and where the grant thereof will not be contrary to the public interest. The reasons to justify the granting of a variance must be substantial, serious and compelling. In light of this standard, appellee's land-use restriction in the case before us cannot be upheld against constitutional attack because of the possibility that an occasional property owner may carry the heavy burden of proving sufficient hardship to receive a variance.

*Girsh Appeal*, 437 Pa. at 240–41, 263 A.2d 395 (internal citation omitted). Omnipoint argues that Easttown Township cannot circumvent an otherwise exclusionary zoning ordinance by relying on the availability of variances.

The flaw in Omnipoint's argument is that Justice Roberts was discussing a use variance, not a dimensional variance, "an important distinction" noted by the Pennsylvania Supreme Court more recently. *Hertzberg v. Zoning Board of Adjustment of the City of Pittsburgh*, 554 Pa. 249, 257, 721 A.2d 43 (1998). In *Hertzberg*, the court held that "the grant of a dimensional variance is of lesser moment than the grant of a use variance, since the latter involves a proposal to use the property in a manner that is wholly outside the zoning regulation." *Id.* Moreover, Justice Roberts drew the same distinction in *Girsh* when he concluded by stating:

> It is not true that the logical result of our holding today is that a municipality must provide for all types of land use. This case deals with the right of people to Live on land, a very different problem than whether appellee must allow certain industrial uses within its borders.

*Girsh*, 437 Pa. at 245, 263 A.2d 395.

Finally, Omnipoint urges that Easttown Township does not provide a

"fair share" allowance for telecommunications uses. The "fair share" principle requires "local political units to plan for and provide land-use regulations which meet the legitimate needs of all categories of people who may desire to live within its boundaries." *Surrick v. Zoning Hearing Board of the Township of Upper Providence*, 476 Pa. 182, 189, 382 A.2d 105 (1977).

The ZHB argues that the "fair share" analysis is only applicable to land "available for development." (Post Trial Memorandum of Defendants, at 4–5). Since the parcel is already developed, housing a synagogue, the Defendants argue that the "fair share" analysis is not germane to our discussion. We find no such limitation in the principle, itself, or in the caselaw. Moreover, the Court of Common Pleas recently applied the "fair share" principle to a case involving a telecommunications tower in Mahoning Township. *Sprint Spectrum L.P. v. Zoning Hearing Board of Mahoning Township*, 46 Pa. D. & C. 4th 187 (2000).

In *Surrick*, the Pennsylvania Supreme Court suggests several factors to be considered in applying the "fair share" principle: (1) whether the area is a logical area for development and population growth; (2) the present level of development; (3) population density data; (4) the percentage of total undeveloped land; and (5) the percentage of undeveloped land available for development. *Surrick*, 476 Pa. 182, 192, 382 A.2d 105 (1977). Omnipoint urges, and we agree, that as a suburb of Philadelphia, the Route 252 Corridor in Easttown Township is a logical area for population growth and development, especially in the context of the use of cellular phones. (N.T. 1/31/02, 16–21; Miller Report, at 2).

Omnipoint correctly observes that, if the Court accepts that cell sites are permissible in the B–Business District of Easttown Township, which we have, the B–Business District comprises only 1.1% of the total area of the township. (Omnipoint's Memorandum of Law, at 22). Since the area in which cell sites can be located is disproportionately small, Omnipoint claims it has established that Easttown Township's zoning ordinance violates the "fair share" analysis.

However, Omnipoint's argument neglects to address the underlying purpose of the "fair share" doctrine—the needs of the community. In *Surrick*, itself, the Pennsylvania Supreme Court noted that, "[o]ur primary concern now is centered upon an ordinance's exclusionary impact." *Surrick*, at 193, 382 A.2d 105. Therefore, like the analysis under the TCA, we must look to the impact on the cellphone use in the township.

> [I]t is not sufficient, absent a showing of total prohibition, for a developer to merely point out that a relatively small area of the municipality is zoned for commercial use without any proof that the needs of the community's residents are not being adequately served.

*Montgomery Crossing Associates v. Township of Lower Gwynedd*, 758 A.2d 285, 289 (Pa.Cmwlth.2000)(quoting *Sullivan v. Board of Supervisors of Lower Makefield Township*, 22 Pa.Cmwlth. 318, 348 A.2d 464, 467 (1975)).

As previously discussed, we do not find that the evidence presented by Omnipoint supports the conclusion that the cellphone users in Easttown Township are unable to access the national network. Excluding Omnipoint, itself, the seven other providers suffered dropped calls or no service only 1.96% of the time and that in the very area where Omnipoint argues that service is poorest. *See infra*, at 7–8. Therefore, Omnipoint has failed to establish that the

residents of Easttown Township or the travelers through the township suffer a negative impact as a result of the zoning ordinance.

### Discrimination Claim

■ In its Complaint, Omnipoint also alleged that the denial of the application by the ZHB constituted a violation of 47 U.S.C. § 332(c)(7)(B)(i)(I), which prohibits unreasonable discrimination against "providers of functionally equivalent services." In denying this claim, Judge Katz stated, "Omnipoint has not advanced any evidence of discrimination, unreasonable or otherwise, by the ZHB. Therefore, the Court finds that the ZHB did not violate section 332(c)(7)(B)(i)(I)." *Omnipoint v. Zoning Hearing Bd. of Easttown Township,* 72 F.Supp.2d 512, 515 n. 3 (E.D.Pa.1999). In its cross-appeal of Judge Katz's decision, Omnipoint did not include the court's finding on the discrimination issue. *Omni-*

*point v. Zoning Hearing Bd. of Easttown Township,* 248 F.3d 101, 103 (3d Cir.2001). As the claim was not presented to the Circuit Court on appeal, it is not properly before this court on remand.

### Civil Rights Claim

Finally, in its Complaint, Omnipoint argues that the ZHB's violation of the TCA also results in a violation of the Civil Rights Act. As the Third Circuit noted, "[t]o the extent Omnipoint claims that the ZHB, acting under color of state law, violated its rights under the TCA, the issues raised need not be addressed until such a violation has been established." *Omnipoint,* 248 F.3d at 109–10. Since we have found no violation of the TCA, Omnipoint has not established a civil rights violation.

■ An appropriate order is attached to this Memorandum.

## APPENDIX
### MIGHTY DUGAN TAKES THE STAND

The outlook wasn't brilliant for the Omnipoints that day,
They'd won round one, but now the Circuit Court was in their way.
And when the Thirds addressed the case, the judges all pronounced,
*Penn Township* is the standard, so to us the case got bounced.

A pole had been the object of their variance request,
So when the Township nixed it, on to court they took their quest.
The District Court agreed, and said the flag pole must arise
But the Circuit said, no way, without some gaps in them there skies.

The TCA's got remedies, but it's also got a trap.
To build that pole in Easttown, you must show a coverage gap.
And not just for your customers, its got to hurt them all.
Providers up and down the band must fail to place a call.

To meet the task of proving this, Paul Dugan took the stand.
With charts and maps and photographs in each and every hand.
He offered them to satisfy the burden of his proof
That gaps appeared despite antennae rising from his roof.

He said if we see red, that's bad—"neg 85" or less.
And if that were the standard, coverage seemed to be a mess.
For many of his maps revealed red splotches everywhere,
And even two that showed some blue had red in their fair share.

The problem is, the law don't say "neg 85's" the test.

It's access to the network that must fail to be the best.
But, using real completed calls—like bumblebees with wings,
Although folks claim they cannot fly, that phone still ding-a-lings.

It's not the signal strength that counts, it's "can you make a call?"
And looking at poor Dugan's charts, he almost made them all.
Verizon, Sprint and Cingular, and all the others, too,
Save Omnipoint the plaintiff, had seen their calls go through.

Oh, somewhere in this favored land, there stands a tower high,
With happy cell providers grabbing signals from the sky.
The TCA allowed those folks to sprinkle poles about.
But there's no new pole in Easttown, Mighty Dugan has struck out.

### ORDER

AND NOW, this _____ day of __ 2002, upon consideration of the evidence and arguments presented by both sides at trial, the evidence presented to the Zoning Hearing Board of Easttown Township, the post-trial submissions, and for the reasons stated in the accompanying Opinion, which shall constitute the findings of fact and conclusions of law of this Court, IT IS HEREBY ORDERED that JUDGMENT IS ENTERED in FAVOR of the DEFEN-DANT and AGAINST the PLAINTIFF.