AMERICAN CELLULAR NETWORK
COMPANY, LLC, Plaintiff,

v.

UPPER DUBLIN TOWNSHIP and
Upper Dublin Township Zoning
Hearing Board, Defendants.

Civil Action No. 01–994.

United States District Court,
E.D. Pennsylvania.

May 20, 2002.

William E. Benner, Doylestown, PA, for
Plaintiff.

George H. Knoell, III, Norristown, PA,
for Defendants.

### MEMORANDUM

DuBOIS, District Judge.

## I. INTRODUCTION

American Cellular Network Company,
LLC, d/b/a Cingular Wireless ("American
Cellular"), is a provider of personal wire-
less telecommunications services. This lit-
igation involves American Cellular's efforts
to construct an eighty-foot monopole cell
site in the Maple Glen section of Upper

Dublin Township ("the Township") so as to remedy what American Cellular perceives as a significant gap in its cellular services. Construction of the cell cite in the desired location required American Cellular to apply for variances from certain provisions of the Township Zoning Ordinance ("Zoning Ordinance"). After a one-day hearing, during which American Cellular presented testimony in support of its application, the Township Zoning Hearing Board ("the Board") denied American Cellular's requested variances. Thereafter, American Cellular filed the present action against the Board and the Township (identified collectively as "defendants"), alleging that the Board's rejection of American Cellular's requested zoning variances violated the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7) ("TCA").

Presently before the Court are American Cellular's Motion for Summary Judgment (Document No. 7, filed June 4, 2001), and Motion for Summary Judgment of Defendants Upper Dublin Township and Upper Dublin Township Zoning Hearing Board (Document No. 8, filed July 6, 2001). As memorialized in the Court's May 11, 2001, Scheduling Order, the parties agree "that the case could be resolved by the filing of a motion or motions for summary judgment." For the reasons stated in this Memorandum, the Court grants American Cellular's Motion and denies the Motion of Upper Dublin Township and Upper Dublin Township Zoning Hearing Board.

## II. BACKGROUND

In this section, the Court sets forth a summary of the facts and procedural history concerning American Cellular's application to the Board for zoning variances. The summary is derived from the record of the January 29, 2001, hearing before the Board ("R."), the exhibits introduced at that hearing, and the Board's "Findings of Fact, Opinion and Order" ("Opinion"), all of which are appended to either American Cellular's Motion or defendants' Motion.[1] Additional facts are set forth in the Court's analysis of American Cellular's substantive claims. *See infra* § IV.A.1.

As a commercial provider of wireless telephone services, American Cellular conducts regular examinations of the strength of its cellular signal. R. at 92. In one such series of examinations, American Cellular identified the Maple Glen section of Upper Dublin Township as an area in which its signal was sufficiently inadequate so as to prevent its subscribers in that area from sustaining uninterrupted cellular telephone calls.[2] R. at 92–98. Maple Glen is defined by the Township boundary lines to the west and north, Susquehanna Road to the south, and Dreshertown Road to the east. R. at 189–90. To remedy its deficient cellular service in Maple Glen, American Cellular investigated various properties in that area for the construction of a new cell site containing antennas for receiving and transmitting signals to its subscribers. R. at 15 16; Ex. A–1.

On July 24, 2000, American Cellular entered into a License Agreement, Ex. A–1, with Mario DiFabio allowing American Cellular to use DiFabio's property at 633 Welsh Road for the construction of a cell

1. Exhibits A–1 through A–15 are appended to American Cellular's Motion. Exhibits B, C, and D are appended to defendants' Motion.

2. A number of cases and law review articles dealing with the TCA provide detailed background explanations of the mechanics of wireless communications networks. *See, e.g.,* *Nextel West Corp. v. Unity Township*, 282 F.3d 257, 259–60 (3d Cir.2002); Stephanie E. Niehaus, Note, *Bridging the (Significant) Gap: To What Extent Does the Telecommunications Act of 1996 Contemplate Seamless Service?*, 77 Notre Dame L.Rev. 641, 646–54 (2002).

site. R. at 16. DiFabio's property is located in the commercial center of Maple Glen—the triangle of land surrounded by Welsh Road, Limekiln Pike, and Norristown Road. R. at 190; *see also* Ex. A–15 (map portraying, *inter alia,* Maple Glen section of Upper Dublin Township). The License Agreement permitted American Cellular to construct behind the one-story building on DiFabio's property a 225–square–foot compound for sheltering radio and electronic equipment, and an eighty-foot monopole. R. at 25–26; Ex. A–1, Lease Exhibit "B."

American Cellular's plans for the cell site incorporated design techniques intended to "stealth" the site and reduce its visual obtrusiveness. R. at 25–26. Specifically, American Cellular planned to use a slender rust-colored pole that would blend into the undeveloped woods abutting the rear of the DiFabio property. R. at 25. American Cellular was, alternatively, willing to use a "pine tree pole." R. at 26. The site's antennas at the top of the pole were not to be supported by a triangular platform, but, rather, were designed to be flush with the pole. R. at 25. As for the equipment shelter, American Cellular planned to screen it with a chain-link fence which, in turn, would be screened by landscaping. R. at 26.

The DiFabio property lies in an area of the Township zoned "SC," for a "Shopping Center" district. R. at 23; Zoning Ordinance § 255–8.[3] There is a building on the property which houses a tailor shop and a barber shop. R. at 16. Although American Cellular's proposed cell site is a permitted use in the SC district under § 255–30.1 of the Ordinance, which governs "[c]ellular communications antennas," its proposal conflicted with the Ordinance's dimensional requirements and required a variance. Specifically, American Cellular's planned structures extended to within sixteen feet of the rear boundary of the DiFabio property, Ex. A–4, and violated the Zoning Ordinance's required forty-foot setback for cellular communications antennas. Zoning Ordinance § 255–30.1.D(2)(c). In planning the construction of the cell site, American Cellular was aware that it was not in compliance with the setback requirement; it believed, however, that the planned location was the most appropriate means of complying with another provision of the Zoning Ordinance, the requirement in § 255–30.1.B(6) that "[a]ll wireless communications facilities shall be of stealth design." R. at 24, 50.

In light of the setback requirement, on September 13, 2000, James R. Rodgers, on behalf of American Cellular, submitted an Application to the Board seeking an "Interpretation of Stealth Provisions" and a variance from the setback requirements. Ex. B at 1. On a section of the pre-printed Application reading "I/We believe that the Zoning Board should approve this request because," Rodgers handwrote as follows:

1. American Cellular Network Corp. d/b/a CellularOne[4] is required by the FCC to provide service in its licensed area. The Maple Glen area of Upper Dublin does not have CellularOne service, nor does it roam on any other service provider's system.

2. Because the property at issue contains commercial improvements, locating the antenna support structure in strict compliance with the ordinance may interfere with the safe and efficient internal traffic circulation. By placing the antenna sup-

---

**3.** All relevant provisions of the Township Zoning Ordinance are set forth at Ex. A–5.

**4.** American Cellular has since changed its trade name from CellularOne to Cingular Wireless.

port structure as indicated on the companion zoning drawings to the rear of the property in close proximity to trees, CellularOne has *substantially* lessened the visual impact from the proposed installation.

Ex. B at 2 (emphasis supplied).

In response to the Application, on October 17, 2000, Township Director of Code Enforcement Richard D. Barton sent a letter to counsel for American Cellular. Ex. A–4. In the letter, Barton informed American Cellular than an "additional variance" would be required. Specifically, Barton cited Zoning Ordinance § 255–30.1.B(1), which provides that a wireless communications facility is not permitted "in a residential zoning district or within 500 feet thereof." American Cellular's proposed location, Barton wrote, "is less than 500 feet from the township's MHD—Mobile Home District, which the township considers to be a residential district." Ex. A–4.

The Mobile Home District referenced in Barton's letter comprises the undeveloped, wooded lot abutting the rear of the DiFabio property. R. at 186. The entire area zoned as a Mobile Home District is owned by Acme Markets. *Id.* When American Cellular executed the License Agreement with DiFabio, it believed that its planned site would be in compliance with the 500–foot residential setback rule because it believed "that the Mobile Home District is technically not classified as a residential district in the ... Zoning Code." R. at 23.

Upon receipt of Barton's letter, American Cellular filed an amendment to its Application "contend[ing] that the Director of Code Enforcement erred when he classified the MHD—Mobile Home District as a residential district." Ex. D. As supporting grounds for this argument, American Cellular stated that "Section 255–8 of the Zoning Code ... specifically identifies the zoning districts of A, A–1, A–2, B, and C as 'residential districts,'" but the section "does not include the MHD—Mobile Home District as a 'residential district.'" *Id.* In the event that the Board agreed with Barton's conclusion, American Cellular further amended "its Zoning Hearing Board application to request a variance from Section 255–30.1(B)(1) to authorize a wireless facility within 500 feet of a residential district." *Id.*

On January 29, 2001, American Cellular presented evidence to the Board in support of (1) its request for a variance from the forty-foot setback requirement; (2) its argument that Barton incorrectly identified the Mobile Home District as "residential"; and (3) in the event the Board rejected its argument as to the classification of the Mobile Home District, its request for a variance from the 500 foot setback from a residential district. Additionally, American Cellular presented evidence in support of its claim that a "significant gap" in cellular service existed in Maple Glen—evidence that a gap existed not only in American Cellular's service, but also in the networks of all five other major cellular providers servicing the Township.

At the conclusion of the hearing, the six-member Board voted unanimously to reject all three components of American Cellular's Application. R. at 224–28. The Board subsequently issued written Findings of Fact and an Opinion. As to the classification of the Mobile Home District, the Board concluded that because "[b]oth by common usage and by definition in the Zoning Ordinance, a mobile home is a residence ....a district containing mobile homes is a residential zoning district in the eyes of the Board." Opinion at 5. The Board then stated that it denied both requested variances because (1) the DiFabio property "is in fact being used for its zoned purposes with the existence of two

operating business and their associated parking facilities," and (2) American Cellular's evidence that, in some areas of the Township, no more than ninety percent of its subscribers had "satisfactory service," did not amount to a hardship. Opinion at 5–6.[5] The Board did not specifically decide whether American Cellular had established a "significant gap" in cellular service, but did state that "[i]t would appear that there is very close to adequate coverage of the Township by some company even by [American Cellular's] standards." *Id.*

In the action now before the Court, American Cellular argues that the Board's decisions constituted a violation of the TCA.[6] In its first three arguments, American Cellular argues that none of the Board's three conclusions were supported by "substantial evidence." As a fourth argument, American Cellular asserts that the Board's decision had the effect of prohibiting cellular service by allowing a "significant gap" in cellular service to persist in the Township. Before addressing American Cellular's specific arguments,

the Court briefly discusses the legal framework of the TCA.

### III. *TELECOMMUNICATIONS ACT OF 1996*

The TCA has been described as an "overhaul of the federal regulation of communications companies." *Omnipoint Communications Enters. v. Newtown Township,* 219 F.3d 240, 242 (3d Cir.2000) (*"Newtown Township"*) (quotation omitted). In enacting the TCA, Congress sought "to create 'a pro-competitive, deregulatory national policy framework designed to rapidly accelerate private sector deployment of advanced telecommunication and information technologies and services to all Americans by opening all telecommunications markets to competition.'" *Nextel West Corp. v. Unity Township,* 282 F.3d 257, 264 n. 6 (3d Cir.2002) (quoting H.R. Conf. Rep. No. 104–458 at 113 (1996), reprinted in 1996 U.S.C.C.A.N. 124). Although the TCA "expressly preserves the traditional authority enjoyed by state and local government to regulate land use and zoning," *APT Pittsburgh Ltd. v. Penn Township,* 196 F.3d 469, 473 (3d Cir.1999) (*"APT"*) (citing 47 U.S.C. § 332(c)(7)),[7] at

---

**5.** The Board's conclusions on American Cellular's requested variances are keyed to Pennsylvania municipal planning law. In applying 53 P.S. § 10910.2, the Supreme Court of Pennsylvania has held "[t]here are essentially four factors" to determine entitlement to a variance:

    (1) that an unnecessary hardship exists which is not created by the party seeking the variance and which is caused by unique physical circumstances of the property for which the variance is sought;

    (2) that a variance is needed to enable the party's reasonable use of the property;

    (3) that the variance will not alter the essential character of the district or neighborhood, or substantially or permanently impair the use or development of the adjacent property such that it is detrimental to the public's welfare; and

    (4) that the variance will afford the least intrusive solution.

*Larsen v. Zoning Bd. of Adjustment of the City of Pittsburgh,* 543 Pa. 415, 672 A.2d 286, 289 (1996). The Board's rejection of American Cellular's requested variances is based on its conclusion that American Cellular met neither of the first two prongs—that is, it did not demonstrate an "unnecessary hardship" and the property was still subject to "reasonable use."

**6.** Count III of American Cellular's Complaint also contains a "State Law Appeal." Because American Cellular does not raise any independent state-law grounds in support of its arguments on the pending cross motions for summary judgment, the Court will limit its consideration to the federal issues—that is, the TCA.

**7.** Specifically, the TCA states: "Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a

the same time, it places limits on "the ability of local authorities to regulate and control the expansion of telecommunications technologies" by allowing courts to "review telecommunication zoning denials more closely than standard zoning decisions." *Newtown Township*, 219 F.3d at 242–43. The limits on local zoning authority are both procedural and substantive in nature.

One procedural limitation establishes the quantum of evidence a local zoning authority must cite in support of a denial with respect to telecommunications facilities: "Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). An important substantive limitation in the TCA covers the quality of wireless service available in a zoning authority's jurisdiction: "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof. . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). The TCA further provides that any party "adversely affected" by a local zoning authority's actions in violation of these provisions "may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction." 47 U.S.C. § 332(c)(7)(B)(v).

In this case, American Cellular raises arguments under both of the above limitations of local zoning authority.[8] Procedurally, American Cellular argues that none of the Board's decisions—rejecting American Cellular's argument that the Mobile Home District is not "residential" and denying its two requested variances—were supported by substantial evidence. Substantively, American Cellular argues that the Board's actions "have the effect of prohibiting the provision of personal wireless services."

Upon its review of the record and the parties' arguments, the Court concludes that American Cellular has indeed proven a substantive violation of the TCA—that the Board's actions "have the effect of prohibiting the provision of personal wireless services." The Court will therefore not consider American Cellular's substantial evidence arguments,[9] but, instead, will proceed to a discussion of American Cellular's "effect of prohibiting" claim.

## IV.   AMERICAN CELLULAR'S "EFFECT OF PROHIBITING" CLAIM

The TCA "does not define what constitutes prohibitive effect." *Nextel*, 282 F.3d at 265. However, the Third Circuit, in a series of recent rulings, has established an analytical framework for evaluating whether a cellular provider has demonstrated a violation of the TCA's "effect of prohibiting" limitation on local zoning authority.

State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A).

**8.** The Court notes that there is no dispute that American Cellular provides "personal wireless services" or that the proposed cell site at issue falls under the TCA's definition of "personal wireless service facilities," thus bring-

ing this case under the TCA's coverage. 47 U.S.C. § 332(c)(7)(C)(i)-(ii).

**9.** The Court need not address both issues because "the substantial evidence review contemplated by subsection 332(c)(7)(B)(iii) is not applicable to the issue of whether a state's denial of an application to construct a personal wireless service facility 'has the effect of prohibiting the provision of personal wireless services.'" *APT*, 196 F.3d at 475.

That analytical framework consists of a two-pronged inquiry.

First, a cellular service provider "must show that its facility will fill an existing *significant gap* in the ability of remote users to access the national telephone network." *APT*, 196 F.3d at 480 (emphasis added). Because the "relevant gap" in the significant gap inquiry "is a gap in the service available to remote users," providers must "include evidence that the area the new facility will serve is not already served by another provider." *Id.* The Third Circuit has further explained that a significant gap in wireless services exists "when a remote user of those services is unable either to connect with the land-based national telephone network, or to maintain a connection capable of supporting a reasonably uninterrupted communication." *Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Borough of Ho–Ho–Kus*, 197 F.3d 64, 70 (3d Cir.1999) (*"Ho–Ho–Kus"*).

The second prong of the inquiry under the TCA's "effect of prohibiting" provision requires a cellular provider to "show that the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve." *APT*, 196 F.3d at 480. To succeed on this prong of the inquiry, the cellular provider must show "that a good faith effort has been made to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative systems designs, alternative tower designs, placement of antennae on existing structures, etc." *Id.*

With the above discussion of the TCA serving as a backdrop, the Court now turns to the merits of American Cellular's "effect of prohibiting" claim by addressing,

in turn, the required two prongs. The Court's review of that claim is *de novo.* *See APT*, 196 F.3d at 475.

## A.  SIGNIFICANT GAP

■ Cases in this Circuit evaluating whether a cellular provider has established a "significant gap" demonstrate that determining whether a gap in service is significant involves at least [10] two sub-questions. The first question is a qualitative one. The Court must ask: has the cellular provider established that the quality of cellular service is sufficiently poor so as to rise to the level of a "significant" gap? *See Omnipoint Communications Enters. v. Zoning Hearing Bd. of Easttown Township*, 189 F.Supp.2d 258, 263–65 (E.D.Pa. 2002) (Hart, M.J.) (*"Easttown"*) (analyzing number of dropped calls, instances of no service, and signal strength); *Cellular Tel. Co. v. Zoning Bd. of Adjustment of Borough of Harrington Park*, 90 F.Supp.2d 557, 565 (D.N.J.2000) (*"Harrington Park"*) (analyzing percentage of dropped calls). The second question relates to the scope of the gap—that is, how many users are affected by the gap, or how large an area is in the gap. The Court must ask: has the cellular provider established that the purported gap in service affects a large enough number of users so as to constitute a "significant" gap? *See Ho–Ho–Kus*, 197 F.3d at 70 n. 2 (noting that "it matters a great deal ... whether the 'gap' in service merely covers a small residential cul-de-sac or whether it straddles a significant commuter highway or commuter railway"); *see also* Niehaus, 77 Notre Dame L.Rev. at 659 (noting that "courts have attempted to differentiate a significant gap from a mere dead spot").

---

**10.**  *See Ho–Ho–Kus*, 197 F.3d at 70 n. 2 ("There may be any number of factors that a reviewing court may find it necessary to con-sider when determining whether a significant gap exists...").

Upon its review of the evidence, the Court concludes that this case presents both qualitative and scope questions. Before discussing those questions more thoroughly, the Court sets forth all of the evidence presented by the parties on the significant gap issue.

### 1. Significant Gap Evidence

### a. Evidence presented to the Board

To establish the presence of a significant gap in cellular coverage in Maple Glen, American Cellular relies on the testimony before the Board of its radio frequency engineer and manager, Jay Hettler.[11] The most relevant of Hettler's testimony for purposes of American Cellular's significant gap argument concerns a "drive test" that he conducted in Maple Glen on November 6, 2000. Hettler explained that to conduct the "drive test," he drove a "vehicle which has all of our competitors' phones and our phone feeding a computer, with a GPS system, totally automated, which makes call after call, and records the—whether the call went through or not." R. at 111–12. The drive test also examined whether the speech was "garbled" and "records signal strength." R. at 112. In addition to a phone connected to American Cellular's service, Hettler's drive test involved phones connected to the services of all five other major service providers covering the Township: AT & T Wireless, Nextel, Sprint, Verizon, and VoiceStream. *Id.*

After conducting the drive test, Hettler produced six computer-generated maps of the Maple Glen area, one for each different cellular service provider. Exs. A 10, A 11, A 14.[12] Superimposed on the maps' displays of the major roadways running through Maple Glen are small circles filled with one of four colors—green, yellow, red, or black. Each color represents a different level of "reliability" of cellular service, and, as such, portrays the reliability of each cellular provider's service in Maple Glen. Hettler explained that a green circle represents "reliable coverage"; a yellow circle represents "unreliable coverage"; and a red circle represents "really bad" coverage. R. at 113.[13]

In his testimony, Hettler further explained the information to be gleaned from the maps by quantifying "unreliable" service. Yellow circles, which represent such "unreliable" service, mean that "approximately 10 percent of the time," a call "cannot go through," the call is "interrupted," the call is "dropped," or voices on the call are "totally unintelligible." R. at 113–14. A red circle means that a cell phone user would "not [be] able to make a call whatsoever." R. at 113.

Hettler testified that his analysis of the maps led him to conclude that all six cellular providers have "unreliable service" in a half-mile stretch of Norristown Road near the Maple Glen commercial center. R. at 119. Hettler explained that it was particularly meaningful to find this confluence of unreliable service after a test conducted in November, when the leaves are "off the trees." R. at 112. Cellular signals are

---

**11.** Hettler is qualified to testify on this subject. In 1986, he obtained a Bachelor of Science degree in electrical engineering from Pennsylvania State University where he "specialized in communication and propagation and digital modulation techniques," R. at 89, and he has more than six years of experience working as a radio frequency engineer in the wireless communications industry. R. at 89–90.

**12.** Hettler produced three exhibits for the six providers because each exhibit contains two maps.

**13.** Hettler did not explain what a black circle represents.

stronger at such a time, Hettler testified, than "when the leaves are on the trees." R. at 112. In addition to presenting evidence concerning the results of the drive test, American Cellular introduced Hettler's testimony and documentary evidence about daily traffic patterns on Norristown Road to support its argument that a large number of cellular users are affected by the unreliable service in the half-mile stretch referenced above. R. at 105, 127; Ex. A–9.

At the hearing before the Board, no rebuttal evidence was presented with respect to Hettler's testimony as to the reliability of service on the relevant half-mile portion of Norristown Road. The Board's findings of fact reflected the undisputed evidence, as it found: "There is a stretch of approximately one-half mile on Norristown Road where all six carrier [sic] have what the Applicant regards as unreliable service." Opinion at 3.

Notwithstanding the fact that the Board did not identify any factual disputes, the Court concludes that there are two factual disputes presented in the record: one with respect to the qualitative question on the sufficiency of cellular service, and another concerning the scope of the purported gap. These factual disputes were the subject of further development of the record after the parties filed their summary judgment motions.

### b.  Further development of the record before this Court

The factual dispute on the qualitative issue arises from defendants' submission of a Supplemental Memorandum of Law (Document No. 11, filed September 24, 2001) with attached affidavit which defendants assert shows that at least one cellular provider, Sprint, has reliable cellular service in the Maple Glen area. To support this conclusion, defendants presented a "propagation report" prepared by Sprint which displayed Sprint's "predicted signal strength" in various parts of Montgomery County. The propagation report lists two different categories: one, identified by green coloring, to show where Sprint predicted that its signal would be received in buildings, and the other, identified by blue coloring, to show slightly weaker signals where Sprint predicted that the signal would not be received in buildings, but that it would be received in cars. On the propagation report, the entire area of Maple Glen is covered by green coloring, meaning that Sprint predicted its signal would be strong enough throughout Maple Glen to be received in buildings.

In response to defendants' additional evidence, American Cellular submitted a Supplemental Memorandum of Law in Opposition to Defendants' Supplemental Memorandum of Law (Document No. 13, filed October 22, 2001), with an attached affidavit of Jay Hettler dated October 15, 2001. In the affidavit, Hettler states that a "propagation report is a computer generated graphic that illustrates predicted coverage from a base station or cell site." Hettler Oct. 15, 2001, Aff. at ¶ 7. Although "propagation reports are generally reliable and serve as a useful tool in radio frequency engineering to predict signal propagation from a cell site," id., "[a] propagation report does not have the same level of accuracy or reliability as an actual drive test." Id. at ¶ 8. Further, Hettler stated, "[a]n actual drive test that measures signal strength like the one that I conducted in the Maple Glen section is more sensitive, more reliable, and is more accurate than a computer generated propagation prediction tool." Id. In light of this view, "[t]here is nothing in the propagation report" to change Hettler's opinion "concerning the actual, measured signal strength for Sprint in the Maple Glen sec-

tion. . . . That is, for a half mile section of Norristown Road, Sprint's signal is too weak to allow its subscribers the ability to carry a reliable wireless telephone call." *Id.* at ¶ 9.

Turning to the factual dispute on the scope question, that dispute arises from the Court's own review of the record. At the hearing before the Board, much of Hettler's testimony focused on the purportedly "unreliable" service on a half-mile stretch of Norristown Road. In support of this testimony, American Cellular presented Exhibit A–9, a "1999 PENNDOT Annualized Average Daily Traffic" report, which identifies the referenced half-mile section of Norristown Road as extending from its intersection with Limekiln Pike in a westerly direction to a point immediately east of its intersection with Butler Pike. Hettler's testimony is fairly interpreted to state that all six cellular providers whose service he tested have "unreliable" cellular service on the *entire* half-mile stretch of Norristown Road. R. at 119.

The Court's review of Hettler's maps, however, reveals that, for at least three providers, Nextel, Sprint, and VoiceStream, the yellow circles representing "unreliable" service appear on only a small part of the relevant half-mile section of Norristown Road—the part immediately west of Limekiln Pike—which represents, in the Court's estimation, one-eighth of a mile. *See* Ex. A–10 (Sprint and VoiceStream); Ex. A–11 (Nextel). The remainder of the half-mile section of Norristown Road for each of these three providers is covered with green circles, representing "reliable" service.

Upon noting these factual disputes and the fact that the Court's May 11, 2001, Scheduling Order did not provide a procedure for resolving them, the Court conducted a telephone conference with counsel for the parties. As a result of that telephone conference, the Court issued its April 22, 2002, Order embodying the parties' agreement that the Court should resolve the aforementioned fact disputes in deciding the motions for summary judgment. Additionally, the Court granted the parties leave to submit additional evidence and supplemental memoranda addressing the factual disputes.

American Cellular submitted a supplemental memorandum (Document No. 15, filed April 26, 2002) and attached an additional affidavit by Jay Hettler dated April 25, 2002, addressing only the factual dispute with respect to the scope of the purported gap in cellular service. In that submission, American Cellular provided an alternative argument [14] that the gap in cellular service is not limited to the half-mile section of Norristown Road, but, rather, that a gap exists throughout Maple Glen. As support for this argument, American Cellular relies on Hettler's statement that:

> When I testified before on January 29, 2001, I concentrated my testimony on the one-half mile section of Norristown Road between Butler Pike and Limekiln Pike. In analyzing the drive test data for all six licensed carriers illustrated on Exhibits A–10, A–11 and A–14 . . . it is clear that all six carriers have gaps in coverage for a distance of approximately one-half mile along other streets in Maple Glen. For example, AT & T Wireless

---

**14.** American Cellular also provided further argument as to why the half-mile portion of Norristown Road constituted a significant gap and a second alternative argument that actual signal strength is weaker than that portrayed on the maps produced before the Board. Be-

cause, as discussed below, *see infra* § IV.A.2.b., the Court agrees with American Cellular's argument concerning the gap in service in the entirety of Maple Glen, the Court does not address these two additional arguments.

has poor [15] coverage extending more than one-half mile along Norristown Road, Welsh Road, and Limekiln Pike. Cingular Wireless has poor coverage for more than one-half mile along Limekiln Pike. Verizon has poor coverage for a one-half mile section of Norristown Road and along Limekiln Pike and Tennis Avenue. Nextel has poor coverage along Limekiln Pike. Sprint has unreliable coverage for more than one-half mile along Butler Pike and along Norristown Road east of its intersection with Limekiln Pike. VoiceStream has unreliable and poor coverage along Limekiln Pike for a distance of approximately one-half mile south of Norristown Road.

Hettler April 25, 2002, Aff. at ¶ 10. Defendants, in their responsive submission, do not challenge these factual assertions, but, instead, argue that the purportedly unreliable service in Maple Glen does not rise to the level of a "significant" gap. The Court relies on the record as supplemented in its determination as to which party is entitled to judgment.

### 2. Legal Analysis

As stated above, the Court's significant gap analysis consists of two questions: a qualitative inquiry and a scope inquiry.

#### a. Qualitative Inquiry

Hettler testified that all six service providers experienced "unreliable" service in the relevant area and defined "unreliable" as indicating a ten-percent call failure rate. The question the Court must ask, then, is whether a ten-percent failure rate is suffi-

ciently poor service to constitute a significant gap.

Two cases in this Circuit have involved similar analyses. The more recent of the two is *Easttown*, a case decided by Magistrate Judge Hart of this Court. In that case, Judge Hart considered the expert report of Paul Dugan, a radio frequency engineer for the cellular provider, Omnipoint. *Easttown*, 189 F.Supp.2d at 263–65. In a drive test similar to that conducted by Hettler in this case, but on different roadways, Dugan tested eight service providers. *Id.* at 264. In the test, approximately eighty calls were made on each telephone. *Id.* at 265. Looking to the number of "dropped calls" and "instances where there was no service," the court stated Dugan's test showed that out of eighty calls made on Omnipoint's service, there were eleven dropped calls and thirteen instances of no service—a thirty percent failure rate. *Id.* In sharp contrast, of the 560 calls made with the other seven providers' phones, only eleven calls, or 1.96% of all calls on the other providers' phones, experienced service problems. *Id.* This evidence, the court concluded, showed "that *only one* provider, Omnipoint, was incapable of providing reliable service to its customers." *Id.* Because the significant gap inquiry requires a showing that all providers experience a gap in service, the court held that Omnipoint's claim under the TCA's "effect of prohibiting" provision failed. *Id.* (citing *APT*, 196 F.3d at 480).[16]

*Harrington Park* is the second case involving a similar analysis. In that case,

**15.** Hettler states that "poor" coverage is represented by the red circles appearing on the maps produced as a result of the drive test. Hettler April 25, 2002, Aff. at ¶ 10.

**16.** In *Easttown,* the court, in addressing the significant gap analysis, limited its qualitative inquiry to the " 'ability of remote users to

access the national telephone network.' " *Easttown,* 189 F.Supp.2d at 263 (quoting *APT,* 196 F.3d at 480). This Court considers both that question and the question whether users are able "to maintain a connection capable of supporting a reasonably uninterrupted communication." *Ho–Ho–Kus,* 197 F.3d at 70.

where Cellular Telephone Co. d/b/a AT & T Wireless sought zoning approval for a cellular site in the borough of Harrington Park, testimony established that "five to seven percent of the calls placed in this area are lost." *Harrington Park*, 90 F.Supp.2d at 565. The court rejected the defendant Zoning Board's argument that this evidence did not establish a significant gap. *Id.* Rather, "[g]iven 'the Telecommunications Act's twin goals of encouraging rapid deployment of new technologies and providing nationwide seamless cellular service to the public,'" the court concluded "that a loss of five to seven percent is a significant gap." *Id.* (quoting *Ho–Ho–Kus*, 197 F.3d at 69); *see also id.* (quoting *Smart SMR of New York v. Borough of Fair Lawn*, 152 N.J. 309, 704 A.2d 1271, 1283 (1998)) (noting that reliable cellular service provides "benefits to 'the general public, commercial entities, as well as fire, police, and other rescue personnel'").

*Easttown* and *Harrington Park* provide useful guideposts in determining what level of unreliability is necessary to establish a significant gap. Although there surely can be no hard-and-fast percentage of failed calls to define a significant gap, the Court concludes that a line of demarcation falling somewhere between 1.96% and five-to-seven percent is a reasonable interpretation of the TCA. In this case, Hettler testified that he defined "unreliable" service as service resulting in ten percent failure—that is, one out of every ten calls "cannot go through," are "interrupted," are "dropped," or have "totally unintelligible" sound quality. R. at 113–14. The ten-percent rate of unreliability is well beyond the line of demarcation defined by *Harrington Park* and *Easttown*. In sum, the Court concludes that, *assuming* the accuracy of Hettler's drive test, American Cellular's evidence of a ten-percent rate of unreliability satisfies the qualitative component of the significant gap inquiry.

The Court underscores the word "assuming," because, as described above, the parties' supplemental memoranda addressing Sprint's propagation report, give rise to a fact question regarding Hettler's conclusions. The Court's decision of this fact question rests on a credibility determination as to which exhibits—Hettler's drive-test-generated maps or Sprint's propagation report—more accurately reflect the quality of cellular service in Maple Glen.

In resolving this question, the Court finds most persuasive Hettler's statement that "[a] propagation report does not have the same level of accuracy or reliability as an actual drive test." Hettler Oct. 15, 2001, Aff. at ¶ 8. Because Hettler's reports are based on empirical testing, and because the propagation report is based only on a mere prediction, the Court finds that Hettler's reports showing that all six cellular service providers had unreliable service in Maple Glen accurately reflect the actual reliability of cellular service in Maple Glen.

The Court concludes that American Cellular has established, qualitatively, a significant gap in cellular service in Maple Glen. Next, the Court addresses the question whether the qualitative gap in cellular service affects a large enough number of users or geographical area to constitute a significant gap.

#### b. Scope Inquiry

█ The inquiry as to the scope of the gap is derived from the Third Circuit's decision in *Ho–Ho–Kus*, where the court stated that "it matters a great deal … whether the 'gap' in service merely covers a small residential cul-de-sac or whether it straddles a significant commuter highway or commuter railway." *Ho–Ho–Kus*, 197 F.3d at 70 n. 2. Such an inquiry is important in significant gap cases because of the unique nature of cellular service: "Unlike

a utility such as electrical power, cellular service is used in transit, so a gap that covers a well-traveled road could affect large numbers of travelers—and the people who are trying to communicate with them." *Id.*

Much of the testimony before the Board and much of the argument in the filings before this Court addresses the question of whether American Cellular has shown a significant gap in a half-mile section of Norristown Road. The Court rejects American Cellular's argument in this respect. The maps produced as a result of Hettler's drive test show that three providers have reliable service on nearly all of the half-mile section of Norristown Road. Because the Third Circuit has adopted what may be called a common denominator approach—analysis of the gap is tied to the service provider with the best service in the purported gap—the gap on Norristown Road, for purposes of the TCA, must be viewed as extending only one-eighth of a mile on Norristown Road. Notwithstanding American Cellular's arguments as to the high level of traffic on this one-eighth-of-a-mile section of Norristown Road, the Court concludes that it is not significant—it covers too small an area and affects too few people.

This conclusion does not, however, end the matter. Rather, the Court finds meritorious American Cellular's argument, supported by Hettler's affidavit, that there is unreliable cellular service throughout the *entire Maple Glen area,* and that the scope of this unreliable service renders the gap "significant." Importantly, it is undisputed that American Cellular's proposed tower on the DiFabio property will remedy this problem by providing reliable cellular service to all of Maple Glen. *See* Ex. A–13

(portraying coverage of proposed cellular site); R. at 133.

In adopting American Cellular's argument placing the focus of the significant gap analysis on the entirety of Maple Glen, the Court notes that American Cellular's argument is a novel one, as the Third Circuit has not stated how tightly the "area" covered by a gap should be defined. In *APT,* the Third Circuit held that "[t]he provider's showing on [significant gap] will thus have to include evidence that the *area* the new facility will serve is not already served by another provider." *APT,* 196 F.3d at 480 (emphasis added). The record before the Court shows that all six providers tested by Hettler clearly have some service in Maple Glen. In light of this fact, it might be argued, following *APT,* that American Cellular cannot establish a significant gap. For example, because Sprint and Verizon are the only providers to have unreliable service on Tennis Avenue, *see* Ex. A–10 (Sprint); Ex. A–11 (Verizon), whereas the other four providers have reliable service on Tennis Avenue, focusing solely on Tennis Avenue would lead to the conclusion that there is no significant gap there.

The Court concludes, however, that focusing on only one roadway improperly narrows the scope of the significant gap analysis. Finding no significant gap in Maple Glen solely on the ground that each provider has *some reliable* service there disregards the fact, conclusively established in the record,[17] that all six providers also have *unreliable* service on extended—more than one-half mile—stretches of various heavily trafficked roads throughout Maple Glen. The net effect of the unreliable service pattern in Maple Glen is that

---

**17.** The Court agrees in all respects with Hettler's affidavit statement quoted at length above. *See supra* § IV.A.1.b.

all cellular subscribers driving through Maple Glen, regardless of which service provider they use, will, at some point, experience unreliable service. Given the Congressional policy underlying the TCA to provide "nationwide seamless cellular service to the public," *Ho–Ho–Kus*, 197 F.3d at 69, the Court concludes that, in this case, the "area" referred to by the Third Circuit in *APT*, must not be viewed as single roadways, but, rather, must be viewed as the entirety of Maple Glen.

The Court draws further support for this conclusion from American Cellular's presentation of testimony that, during one year, its users alone made 4,000 cell phone calls to the Township's 911 emergency service. R. at 127. Although this testimony does not show conclusively how many 911 calls were made from Maple Glen, the Court draws an inference that, because Maple Glen comprises approximately thirty-three percent of the geographic area of Upper Dublin Township, R. at 190, and because users of the other five providers' cellular service undoubtedly place 911 calls on their cellular telephones, the number of cellular 911 calls originating on Maple Glen roadways is a large one. There is thus a weighty public-safety interest in focusing the significant gap analysis on the entirety of Maple Glen.

Given the Court's adoption of this analysis, and given Hettler's credible affidavit statement that all six providers have unreliable service at some point in Maple Glen, the Court concludes that American Cellular has satisfied its burden of proving that the scope of the gap in cellular service is sufficiently broad to constitute a significant gap.

## B. LEAST INTRUSIVE ALTERNATIVE

■ In evaluating American Cellular's argument that the DiFabio site is the least intrusive option, the Court must consider the values that the Board sought to serve in denying American Cellular's Application. *APT*, 196 F.3d at 480. The Board's Opinion, however, does not state any affirmative reasons for denying the Application; rather, it is limited to an analysis of what the Board concluded was American Cellular's failure to establish a right to variances under state and local law.

Nevertheless, the record of the proceedings before the Board makes clear that the prevailing objection to placing a new cellular site in the Maple Glen community was based on aesthetics. At the conclusion of the hearing, immediately before the Board voted to reject the Application, seven residents of the Township addressed the Board. R. 214–23. The residents' statements unanimously reflect an objection to the aesthetic obtrusiveness of the proposed site. For example, Carol Benet, a resident of the Township and Vice President of the Maple Glen Village Association, explained that the Association had worked with land planners and residents to "create a village atmosphere" in Maple Glen. R. at 215 16. The input that Benet had received from other residents showed no support for an "80–foot tree looking device in the middle of our village." R. at 216. Notwithstanding the Maple Glen community residents' aesthetic concerns, the Court concludes that American Cellular has satisfied its legal duty to adopt the least intrusive plan for its new cellular site.

With respect to American Cellular's pursuit of alternative systems designs and tower designs, the undisputed evidence shows a concerted effort to construct a safe cell site with minimal obtrusiveness. The DiFabio property is in a district zoned for commercial use, and it does not border any low-density residential districts. R. at 23; Ex. A–15. The proposed site is behind a one-story commercial building which will

provide a degree of screening. R. at 50. American Cellular expressed flexibility in how it would design the monopole, proposing use of either a rust-colored pole or a "pine tree" pole so as to blend into the undeveloped, wooded background. R. at 25 26. The antennas on the monopole would be flush with the pole as opposed to resting on a more visible triangular structure. R. at 25. The pole's height would be eighty feet—the absolute minimum necessary for American Cellular's purposes—which is much lower than the standard 150–foot or 160–foot pole. R. at 51, 135–36. This height would be close to the height of some of the pine trees in the undeveloped, wooded area abutting the DiFabio property. R. at 50–51. Finally, there would be no danger of damage to property in the extremely unlikely event that the pole should fall. R. at 82–86.

Defendants' sole argument on this prong of American Cellular's "effect of prohibiting" claim is that American Cellular has not undertaken a good faith effort to investigate less sensitive sites. Specifically, defendants argue that other sites were available both within the Township and in neighboring Horsham Township, and that the owners of those sites were willing to negotiate agreements with American Cellular. The Court finds, however, that the testimony of James Rodgers, the site development consultant to American Cellular who filed the Application with the Board on American Cellular's behalf, undermines defendants' argument.

Rodgers' testimony demonstrates that American Cellular's search for a site that would adequately address the gap in cellular coverage in Maple Glen was an exhaustive one. In an attempt to avoid constructing a new site, American Cellular investigated placing antennas on an existing structure, such as a water tower on Fort Washington Avenue in the Township.

R. at 20–21. Although Sprint presently has a cell site on that water tower, that site was placed there before the Township amended its Zoning Ordinance to require a 500–foot buffer between cell sites and residential neighborhoods. *Id.* The amendment had the prospective effect of preventing cellular service providers from placing new cell sites on the water tower thus preventing American Cellular from using it. Additionally, American Cellular explored constructing a new site in Horsham Township, but found zoning restrictions in that township made such an option unfeasible. R. at 38. As for construction of a new site in Upper Dublin Township, American Cellular explored several other sites. A Genuardi's grocery store had no interest in entering into a leasing agreement with American Cellular. R. at 38–39. The same was true for a deli owner. R. at 39. A golf course, Arbor Meadow Farms, expressed an interest in allowing construction of the site on its property, but, upon investigation, found that a deed restriction prevented such construction. R. at 39.

Aside from the DiFabio property, only two property owners, the owner of a vacant property next to the DiFabio property, and the owner of a Dunkin' Donuts, expressed an interest in allowing construction of the site on their properties. R. at 39. Had American Cellular chosen the vacant property next to the DiFabio property, the same concerns raised by community members as to the visual obtrusiveness of the site would have applied. Additionally, American Cellular found that a cellular site would be a more appropriate fit with zoning regulations at the DiFabio property than at the Dunkin' Donuts site. *Id.*

Of additional importance to the Court's analysis is the record evidence that the Board's interpretation of the Mobile Home District as a "residential" district would

eliminate nearly every possible alternative for American Cellular's proposed cellular site. At the hearing before the Board, American Cellular introduced a "Site Evaluation"—a map of the Township portraying all locations where a cell site would be permissible under the Zoning Ordinance. Ex. A–15; R. at 188–89. Taking into account the required 500–foot buffer zone from all residential districts, including the Mobile Home District, the Site Evaluation shows only one site in Maple Glen where a cell site could be located—the Temple University Ambler campus. R. at 190–91; Ex. A–15. As James Rodgers testified, American Cellular spoke with appropriate personnel at the Temple campus about procuring a lease for a cell site, but Temple was not interested in negotiating such a lease. R. at 20. Thus, a combination of factors, including Temple University's unwillingness to negotiate with American Cellular and the Board's interpretation of the 500–foot buffer zone to apply to the Mobile Home District, effectively eliminated every potential cell site in Maple Glen.

In sum, defendants provide no evidence in support of their bare assertion that less intrusive sites were available. The Court therefore concludes that, in addition to diligently pursuing alternative designs to limit the obtrusiveness of the cell site, American Cellular satisfied its legal duty to select the least intrusive property to locate its cell site.

In reaching this conclusion, the Court is enforcing the mandate of the TCA. The Court does not pass judgment on the legitimate concerns of Maple Glen residents that a cell site in the Maple Glen commercial center will detract from the community's aesthetic vision. By expressly preserving local zoning authority, while at the same time "limiting the ability of local authorities to regulate and control the expansion of telecommunications technologies," *Newtown Township*, 219 F.3d at 243, Congress, in enacting the TCA, struck a balance between the interests of communities and the interests of wireless service providers and their subscribers. In this case, the evidence shows that the Township's efforts to regulate the placement of American Cellular's proposed cell site has upset that balance. The Court's Order provides the remedy to which, in the judgment of Congress, American Cellular is legally entitled.[18]

## V. CONCLUSION AND REMEDY

For the foregoing reasons, American Cellular has proven that the Board's decision had the "effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). Accordingly, the Court grants American Cellular's Motion for Summary Judgment, and denies the Motion for Summary Judgment of Defendants Upper Dublin Township and Up-

---

**18.** As a coda, the Court notes that one of the reasons cited by the Board for denying American Cellular's application was "that the very existence of this alleged gap in coverage occurred only because smaller hand-held cell phones are being sold to its customers" and that "[w]hen original larger units were used there was no hole in coverage." Opinion at 6 (citing R. at 97). This conclusion was a response to American Cellular's presentation of evidence that advancing technology has allowed the development of smaller cell phones which appeal to wireless users. R. at 121–22.

The Court rejects the Board's reasoning as a basis for denying American Cellular's requested variances. By citing the decreased size of cellular telephones as a reason to deny American Cellular's application for zoning variances, the Board has essentially blamed advancing technology for causing the service gap in Maple Glen. Such reasoning contravenes the policy goals underlying the TCA: to promote the rapid acceleration of "private sector deployment of advanced telecommunication and information technologies and services to all Americans." *Nextel*, 282 F.3d at 265 n. 6 (quotation omitted).

per Dublin Township Zoning Hearing Board.

As for relief, although the "TCA does not specify a remedy for violations of the cellular siting subsection.... the majority of district courts that have heard these cases have held that the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits." *Cellular Tel. Co. v. Town of Oyster Bay,* 166 F.3d 490, 497 (2d Cir.1999) (collecting cases); *see also Brehmer v. Planning Bd. of Town of Wellfleet,* 238 F.3d 117, 120–21 (1st Cir.2001); *Sprint Spectrum L.P. v. Zoning Hearing Bd. of Willistown Township,* 43 F.Supp.2d 534, 543 (E.D.Pa.1999). In this case, however, even had the Board granted American Cellular's Application, § 255–30.1.C of the Zoning Ordinance would have required American Cellular to seek approval of a conditional use. The record demonstrates that American Cellular is prepared to proceed with such an application. R. at 23–24.

Accordingly, the Court will grant injunctive relief as to American Cellular's Application for two dimensional variances, and remand the case to the Upper Dublin Township Zoning Hearing Board for further proceedings consistent with this Memorandum. *See Willistown Township,* 43 F.Supp.2d at 543.

An appropriate order follows.

### *ORDER*

**AND NOW,** this 20th day of May, 2002, upon consideration of American Cellular's Motion for Summary Judgment (Document No. 7, filed June 4, 2001), the Motion for Summary Judgment of Defendants Upper Dublin Township and Upper Dublin Township Zoning Hearing Board (Document No. 8, filed July 6, 2001), all responsive and supplemental filings to the cross motions, and the record of proceedings before the Upper Dublin Township Zoning Hearing Board, for the reasons stated in the foregoing Memorandum, **IT IS ORDERED** as follows:

1. American Cellular's Motion for Summary Judgment is **GRANTED;**

2. The Motion for Summary Judgment of Defendants Upper Dublin Township and Upper Dublin Township Zoning Hearing Board is **DENIED;**

3. The Upper Dublin Township Zoning Hearing Board shall is **ENJOINED TO APPROVE** American Cellular's Application for

(a) a variance from the setback requirements of Upper Dublin Township Zoning Ordinance § 255–30.1.D(2)(c) (the forty-foot requirement); and

(b) a variance from the setback requirements of Upper Dublin Township Zoning Ordinance § 255–30.1.B(1) (the 500–foot requirement); and

4. The Upper Dublin Township Zoning Hearing Board is **ENJOINED TO CONDUCT** further conditional use proceedings as required by Upper Dublin Township Zoning Ordinance § 255–30.1.C in a manner consistent with the foregoing Memorandum.