

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-5-2003

# Omnipoint Comm Entr v. Zoning Hearing

Precedential or Non-Precedential: Precedential

Docket No. 02-2194

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

## Recommended Citation

"Omnipoint Comm Entr v. Zoning Hearing" (2003). *2003 Decisions.* Paper 421.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/421

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed June 4, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2194

OMNIPOINT COMMUNICATIONS
ENTERPRISES, L.P.,
                                        *Appellant*

v.

ZONING HEARING BOARD OF
EASTTOWN TOWNSHIP

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. No. 99-cv-02080)
Magistrate Judge: Hon. Jacob P. Hart

Argued: December 19, 2002

Before: SLOVITER, McKEE, and ROSENN, *Circuit Judges*

Sur Panel Rehearing Submitted May 13, 2003

Before: SLOVITER, McKEE, and ROSENN, *Circuit Judges*

(Filed: June 4, 2003)

Paul J. Lawrence (Argued)
Jay Carlson
Preston, Gates & Ellis
Seattle, WA 98104-7078

James C. Dalton
Christopher H. Schubert
Riley, Riper, Hollin & Colagreco
Paoli, PA 19301-0568

*Attorneys for Appellant*

Andrew D. H. Rau (Argued)
Unruh, Turner, Burke & Frees
West Chester, PA 19381-0562

John S. Halsted
Gawthrop, Greenwood & Halsted
West Chester, PA 19381-0562

Paola Tripodi Kaczynski
Holsten & Associates
Media, PA 19063-3301

*Attorneys for Appellee*

## OPINION OF THE COURT

SLOVITER, *Circuit Judge.*

This matter is before us on a Petition for Rehearing filed by the Easttown Township Zoning Board ("Zoning Board") from the decision of this panel filed February 12, 2003. In that opinion, originally reported at 319 F.3d 627 (3d Cir. 2003), we considered the appeal of Omnipoint Communications Enterprises, L.P. from the decision of the Magistrate Judge who upheld the Zoning Board's rejection of Omnipoint's application for a variance to locate its telecommunications tower in a residential district. In our original decision authored by Judge Rosenn we affirmed in part, but vacated in part and remanded to the Magistrate Judge with directions to recalculate the call failure rate in the area at issue to determine whether there is a significant gap in telecommunications service in Easttown Township.

The Zoning Board filed a Petition for Rehearing arguing that the panel decision was contrary to the decision of this court in *APT Pittsburgh Ltd. v. Penn Township*, 196 F.3d 469 (3d Cir. 1999), where we held that a provider whose

application has been denied must show both that its facility will fill an existing significant gap in the ability of remote users to access the national telephone network and that the manner in which it proposes to fill that gap is the least intrusive on the values that the denial sought to serve. The Petition for Rehearing argued that the panel decision erred in its conclusion regarding the manner in which the relevant gap should be determined. We directed Omnipoint to file an Answer to the Petition for Rehearing, and after reconsideration the panel majority has vacated the original opinion and agreed with the position of the Zoning Board for the reasons set forth hereafter. Judge Rosenn continues to adhere to the position in his original opinion. Because the panel majority disagrees only with parts II and VII of the original opinion, we reproduce the introduction (excising only the last sentence thereof), Parts I, III, IV, V and VI of Judge Rosenn's original opinion which we incorporate herewith, inserting asterisks to reflect omissions:

This case raises several important questions concerning the burgeoning wireless telecommunications industry and the interpretation and application of the Telecommunications Act, 47 U.S.C. § 151 *et seq.* (TCA). Omnipoint is a wireless telecommunications provider that claims that there is a gap in the wireless telecommunications services available to remote users in Easttown Township, Pennsylvania. Omnipoint sued the Zoning Hearing Board (ZHB or Zoning Board) in the United States District Court for the Eastern District of Pennsylvania, claiming that the ZHB violated the prohibition and anti-discrimination provisions of the TCA by denying Omnipoint's request for a variance to locate a telecommunications tower in a residential district. *See* 47 U.S.C. § 332(c)(7)(B)(i). Furthermore, Omnipoint alleges that the ordinance under which its variance application was denied violates Pennsylvania law because it is either *de jure* or *de facto* exclusionary and fails to provide a "fair share" of Township land for telecommunications uses.

The District Court initially issued a writ of mandamus ordering the ZHB to grant a variance because the Court held that the ZHB decision relied exclusively on aesthetic

concerns in its denial and not on substantial evidence supporting rejection. 72 F. Supp.2d 512 (E.D. Pa. 1999). We vacated this writ and remanded the case to the District Court for reconsideration in light of *APT Pittsburgh Ltd. v. Penn Township*, 196 F.3d 469 (3d Cir. 1999). *See Omnipoint Communications Enterprises, L.P. v. Zoning Hearing Bd. of Easttown Township*, 248 F.3d 101 (3d Cir. 2001) (Omnipoint I). On remand, Magistrate Judge Hart (MJ) denied Omnipoint's claims because he concluded that Omnipoint had failed to establish a "significant gap" or unreasonable discrimination under the TCA, or unconstitutional exclusion under Pennsylvania law.

* * *

## I.

Omnipoint is a licensed provider of wireless digital telephone communications services. As such, it uses a low power radio signal that is transmitted between a portable telephone and an Omnipoint antenna. The antenna then feeds the radio signal to an electronic device that is located nearby. In turn, that device connects the signal to an ordinary telephone line and routes it anywhere in the world. The combination of antenna and equipment is known as a cell site. Because of the low radio signal used by Omnipoint, the range of the cell site is quite small. For example, in Easttown Township, the maximum coverage of a cell site is two miles. When a wireless communication facility (WCF) is not available to cover a specific geographic area, customers who live in or travel through that area will experience unreliable service, dropped calls, or an inability to connect to the Personal Communication Service (PCS) network.[1]

Omnipoint sought to place a PCS tower in Easttown Township because of the gap in its wireless service. Omnipoint hoped to construct a 110-foot stealth flagpole designed PCS tower, 24 inches in diameter at the base and

---

1. PCS differs from "cellular" technology in that it allows for the digital, wireless transmission of video, text, and messaging information in addition to the transmission of voices.

tapering to 16 inches at the top.[2] The fiberglass flagpole structure is designed to incorporate the telecommunications antennae which would be invisible from the outside. For this flagpole, Omnipoint leased space on land owned by the *Or Shalom Synagogue,* located in an area zoned as residential. Under Easttown's zoning ordinance, a communications tower is not a permissible use in residential districts and no residential structure may be higher than thirty-five feet.[3]

Omnipoint applied to Easttown Township's Zoning Hearing Board for use and height variances. It also challenged the validity of the zoning ordinance under Pennsylvania law and the TCA. Omnipoint alleged that the extant ordinance prohibited or effectively prohibited wireless service in violation of the TCA. ZHB held three public hearings on the applications at which a number of local citizens complained that the stealth tower would be an eyesore. ZHB issued a detailed written decision denying Omnipoint's application and stating that the ordinance was valid under both Pennsylvania and federal law.

The District Court granted Omnipoint's motion for summary judgment in part and ordered ZHB to grant Omnipoint's application. 72 F. Supp.2d 512 (E.D. Pa. 1999).[4]

---

2. WCFs must be mounted at a minimum height, which varies depending on the topography and vegetation of the region, the amount of service area to be covered, and other factors. The proposed tower would be located within a thirty-feet by thirty-feet enclosure, surrounded by an eight-foot high chain-link fence topped with barbed wire. *See* ZHB Decision, A 668.

3. At the time of Omnipoint's zoning application, the ordinance did not explicitly provide for communications towers. Easttown has since amended its ordinance to allow cellular communications facilities as a conditional use in business and multi-family conditional use districts. *See* 72 F. Supp.2d at 514 n.2.

4. The District Court did not rule on Omnipoint's state law claims or its claim that the ZHB's decision violated 47 U.S.C. § 332(c)(7)(B)(i)(II) by prohibiting wireless service. Omnipoint's federal suit also included a civil rights claim under 42 U.S.C. § 1983 which Judge Katz denied because he ruled that the TCA's remedial scheme was sufficiently comprehensive to infer Congress' intent to foreclose § 1983 remedies. *See* 72 F. Supp.2d at 517. Judge Katz also found that Omnipoint had not shown a substantive due process violation. *Id.*

We vacated that decision. On remand, the parties consented to have the case proceed in a bench trial before the U.S.M.J. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.[5] The parties supplemented the record with expert reports and testimony regarding telecommunications services in Easttown. Omnipoint's principal witness, radio frequency engineer Paul Dugan, supervised drive tests in which approximately six hundred forty actual calls were made using eight cell phones of various providers. Dugan asserted that a signal strength of "negative 85 dbm" was necessary for reliable service.[6] On April 1, 2002, the MJ entered judgment in favor of ZHB. *See* 189 F. Supp.2d 258 (E.D. Pa. 2002). The MJ found that Omnipoint had failed to establish a correlation between the negative 85 dBm standard and users' actual ability to access the national telephone network. The MJ placed significant weight on his finding that mobile phones other than Omnipoint's experienced problems only 1.96% of the time in Easttown. *See* 189 F. Supp.2d at 265. He also concluded that the ordinance was not exclusionary. Omnipoint timely appealed.[7]

\* \* \*

### III.

The Magistrate Judge found as a fact that Omnipoint's stealth flagpole was the least intrusive of the possible alternatives. *See* 189 F. Supp.2d at 262. We do not disturb this finding because it is not "clearly erroneous." *See Warner-Lambert Co.*, 204 F.3d at 89 n.1. The Township cites the ZHB's original findings that Omnipoint considered few other sites and approached a horse farmer but did not

---

5. This case involves a mixture of federal and state claims. The federal claims arise under the TCA. The Magistrate Judge had jurisdiction over these claims pursuant to 28 U.S.C. § 1331. The Magistrate Judge also had jurisdiction to resolve Omnipoint's state statutory and constitutional challenges to the ordinance pursuant to 28 U.S.C. § 1367(a). *See Omnipoint I*, 248 F.3d at 108 n.5.

6. Omnipoint has not cited any Federal Communication Commission standard for call completion rates. *See* 189 F. Supp.2d at 264.

7. The MJ's April 1, 2002 decision was a final order for the purposes of 28 U.S.C. § 1291.

follow up. ZHB's brief also criticizes Omnipoint for not engaging in studies to assess the visual and auditory impact of the flagpoles on the neighboring properties.

Magistrate Judge Hart found that the horse farmer was not interested in leasing the property and that Omnipoint considered other sites but did not choose them because Omnipoint was involved in unrelated litigation with the owners. *See* 129 F. Supp.2d at 262-63.[8] Thus, the MJ's finding that the stealth flagpole was the least restrictive alternative is not clearly erroneous.

IV.

In Pennsylvania, a land use restriction is a valid exercise of a municipality's police power when it promotes public health, safety, and welfare and is substantially related to the purpose it purports to serve. *See Kirk v. Zoning Hearing Bd of Honey Brook*, 713 A.2d 1226, 1229 (Pa. Commw. 1998). A zoning ordinance is presumed valid and a party challenging it has a heavy burden of proving its invalidity. *See Penn Township*, 196 F.3d at 475. This presumption can be overcome by proof that the ordinance totally excludes an otherwise legitimate use. *See Farrell v. Worcester Township Bd. of Supervisors*, 481 A.2d 986, 989 (Pa. Commw. Ct. 1984).[9] Exclusionary ordinances take two forms: *de jure* and *de facto. De jure* exclusion exists where "the ordinance, on its face, totally bans a legitimate use." *Id. De facto*

---

8. Moreover, the MJ could reasonably have concluded that a tower in the business district would not have remedied Omnipoint's gap because Omnipoint explained that the maximum coverage of its technology's cell sites in the Township is two miles.

9. A party seeking a use variance must show that the zoning restriction "inflicts unnecessary hardship on the applicant," and: (1) that there are unique physical circumstances or conditions peculiar to the property that create the hardship; (2) that because of these circumstances or conditions, there is no possibility that the property can be developed in conformity with the zoning ordinance; (3) that the applicant did not create the unnecessary hardship; (4) that the variance, if granted, would not alter the essential character of the area; and (5) that the variance, if granted, would represent the least modification possible to the regulation at issue. 53 P.S. § 10910.2 (2002).

exclusion exists "where an ordinance permits a use on its face, but when applied acts to prohibit the use throughout the municipality." *Id.*[10] The MJ held that Easttown Township Ordinance 160-80 was neither *de jure* nor *de facto* exclusionary. We agree.

The ordinance is not facially exclusionary. As interpreted, it does not totally ban a legitimate use. Although the ordinance did not explicitly provide for telecommunications towers, the ZHB twice granted variances for telecommunications towers in the business district under a catch-all provision. 189 F. Supp.2d at 266. Omnipoint argues that a telecommunications tower does not fall within the catch-all provision because it is not of the same "general character" as any of the enumerated uses. However, the ZHB's interpretation of a municipality's zoning ordinance is entitled to weight because it reflects the construction of a statute by an entity charged with its execution and application. *See Sprint Spectrum v. Zoning Hearing Bd. of Mahoning Township*, 46 Pa. D. & C.4th 187, 192 (Carbon County CCP 2000). Furthermore, simply because an ordinance does not expressly permit a use does not necessarily mean that it negates that use. *Cf. APT Pittsburgh Ltd. P'ship v. Lower Yoder Township*, 111 F. Supp.2d 664, 670 (W.D. Pa. 2000). Otherwise, the TCA would force localities to enshrine every change in the telecommunications industry into local ordinances at an unrealistically rapid rate. *See id.*

The ordinance was not *de facto* exclusionary either.

10. Exclusionary impact can invalidate an ordinance without evidence of exclusionary intent. *Overstreet v. Zoning Hearing Bd. of Schuylkill Township*, 618 A.2d 1108, 1113 (Pa. Commonw. Ct. 1992). If a party rebuts the presumption of constitutionality by presenting sufficient evidence that an ordinance is exclusionary, the burden then shifts to the state to demonstrate that the zoning ordinance bears a substantial relationship to public health, safety and welfare. *Id.*; *see also Exton Quarries, Inc. v. Zoning Bd. of Adjustment of W. Whiteland Township*, 228 A.2d 169, 179 (Pa. 1967) ("[A] zoning ordinance which totally excludes a particular business from an entire municipality must bear a more substantial relationship to the public health, safety, morals and general welfare than an ordinance which merely confines that business to a certain area in the municipality.").

Omnipoint argues that the height restrictions contained in the zoning ordinance effectively prohibit the establishment of functional telecommunication facilities in Easttown Township. The ordinance contained a thirty-five foot height restriction in residential areas and a fifty-foot height restriction in business districts. *See* 189 F. Supp.2d at 267. The Magistrate Judge rejected this argument because the ZHB had previously granted height variances for communications facilities. *Id.* at 268; *see also Penn Township*, 196 F.3d at 476 (explaining that "to succeed in its exclusionary zoning claim . . . [the Plaintiff] had to prove that no other telecommunications provider, including itself, could build a functional tower . . .").[11]

Omnipoint's alternative argument under the "fair share" principle also fails. The "fair share" principle applies when an ordinance only partially excludes a land use. An ordinance is exclusionary when a municipality fails to provide for its "fair share" of a legitimate land use such as multi-family dwellings. *See Surrick v. Zoning Hearing Bd. of the Township of Upper Providence*, 382 A.2d 105 (Pa. 1977). Local political units must plan for and provide land-use regulations that meet the legitimate needs of all categories of people who may desire to live within its boundaries. *See id.* at 108.[12]

---

11. Omnipoint argues that Easttown Township cannot circumvent an otherwise exclusionary zoning ordinance by relying on the availability of a variance because of the high hurdles applicants must normally face to obtain a variance. *Cf. Girsh Appeal*, 263 A.2d 395 (Pa. 1970). This argument has greater force when plaintiffs seek a use variance, as in *Girsh Appeal*, rather than a height variance. *See* 189 F. Supp.2d at 268. A use variance is more burdensome to obtain than a height variance. *Hertzberg v. Zoning Board of Adjustment of the City of Pittsburgh*, 721 A.2d 43, 47 (Pa. 1998). Although Omnipoint sought both a use and a height variance, its argument that the ordinance is *de facto* exclusionary necessarily focuses on the ordinance's height restrictions. Thus, the MJ properly rejected this argument.

12. In *Surrick*, the Pennsylvania Supreme Court articulated several factors to be considered in applying the "fair share" principle in the housing context: (1) whether the area is a logical area for development and population growth; (2) the present level of development; (3) population density data; (4) the percentage of total undeveloped land; and (5) the percentage of undeveloped land available for development. *See Surrick*, 382 A.2d at 110.

Omnipoint contends that Easttown Township fails to provide a "fair share" allowance for telecommunications uses. The B-Business District comprises only 1.1% of the total area of Easttown Township.[13] The relevant inquiry is whether Omnipoint has carried its "heavy burden" of showing that the needs of the community's residents are not being adequately served. *See Montgomery Crossing Assoc. v. Township of Lower Gwynedd*, 758 A.2d 285, 289 (Pa. Cmwlth. Ct. 2000); *Schubach v. Silver*, 336 A.2d 328, 335 (Pa. 1975). Other telecommunications providers have been able to serve the needs of their customers by placing towers within the business district. To overcome the presumption that the ordinance is constitutional, Omnipoint would have had to show a causal link between the small area of land zoned for business use and the community residents' inability to meet their needs. This, it failed to do.

V.

In its original complaint, Omnipoint alleged that ZHB's denial of Omnipoint's application constituted a violation of 47 U.S.C. § 332(c)(7)(B)(i)(I) because ZHB unreasonably discriminated against "providers of functionally equivalent services." Judge Katz denied this claim on the ground that Omnipoint had not shown discrimination, reasonable or otherwise. *See* 72 F. Supp.2d at 515 n.3. In its cross-appeal of Judge Katz's decision, Omnipoint did not include the court's finding on the discrimination issue. *Omnipoint I*, 248 F.3d at 103. The MJ ruled that this discrimination issue was not properly before him because it had not been presented to the panel on the first appeal. *See* 189 F. Supp.2d at 270.

Omnipoint argues that a cross-appeal is only required when the appellee advances an issue on appeal that aspires to alter the trial court's decision. *Cf. New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1205 (3d

---

13. The Township contests this finding and argues that the business district is larger than Omnipoint asserted it was at trial. However, the MJ adopted the 1.1% figure as a fact, *see* 189 F. Supp.2d at 269, and this finding is not clearly erroneous.

Cir. 1991). Appellee is free to assert any alternative theory in support of the District Court's decision, even without a formal cross-appeal. *See id.*; *see also Scott v. Univ. of Delaware*, 601 F.2d 76, 91-92 (3d Cir. 1979) (Adams, J., concurring).

The discrimination issue is properly before us and we now reject Omnipoint's argument on the merits. The TCA prohibits unreasonable discrimination against "providers of functionally equivalent services." 47 U.S.C. § 332(c)(7)(B)(i)(I). The TCA does not prohibit all discrimination against providers, only unreasonable discrimination. *See AT & T Wireless PCS v. Virginia Beach*, 155 F.3d 423, 427 (4th Cir. 1998).

In *Nextel*, we explained that the purpose of the "unreasonable discrimination" language of § 332(7)(B)(i)(I) is to ensure that once the municipality allows the first wireless provider to enter, the municipality may not unreasonably exclude subsequent providers who similarly wish to enter and create a competitive market in telecommunications services. *See Nextel*, 282 F.3d at 264 n.6. *Nextel* creates a two-part test for determining if a zoning board has unreasonably discriminated. First, the plaintiff must show that the relevant providers are functionally equivalent. Second, the plaintiff must show that the government body unreasonably discriminated. *Id.* at 266.

The equivalency of function relates to the telecommunications services the entity provides rather than to the technical particularities of its operations. *See id.* at 266 n.13. We hold that Omnipoint is functionally equivalent to the other telecommunications providers that were granted variances in Easttown Township.

Omnipoint's discrimination claim fails under the second part of the test. Permitting the erection of a communications tower in a business district does not compel the ZHB to permit a similar tower at a later date in a residential district. *See Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 639 (2d Cir. 1999); *see also* H.R. Conf. Rep. 104-458, at 208, reprinted in 1996 U.S.C.C.A.N. at 222 ("the conferees do not intend that if a State or local

government grants a permit in a commercial district, it must also grant a permit for a competitor's 50-foot tower in a residential district"). The two communications towers that existed in Easttown at the time of Omnipoint's application were both located in areas zoned for business rather than residential use. *See* 72 F. Supp.2d at 515 n.3. Thus, the ZHB's denial was not unreasonable and Omnipoint's § 332(c)(7)(B)(i)(I) challenge fails.[14]

## VI.

Omnipoint dedicates a significant portion of its brief to a direct attack on *Penn Township.* It points to the TCA, which seeks to create a "pro-competitive, de-regulatory national policy framework designed to rapidly accelerate private sector deployment of advanced telecommunication and information technologies and services to all Americans by opening all telecommunications markets to competition." H.R. Conf. Rep. No. 104-458, at 113 (1996), reprinted in 1996 U.S.C.C.A.N. 124; *see also Nextel,* 282 F.3d at 264 n.6. Omnipoint argues that *Penn Township* undermines Congress' purpose of creating a competitive market for telecommunications services and has the effect of

---

14. Omnipoint's argument to the contrary focuses on the ugliness of the monopole previously approved by the ZHB for placement at the Berwyn Fire Company and the relative ease with which a variance was granted in that case. Even if the Berwyn Fire Company monopole is uglier than the proposed Omnipoint structure, that does not alter Omnipoint's intention to place its PCS tower in an area zoned for residential use. Furthermore, Omnipoint contests the ZHB's finding that the proposed flagpole would be a "blight" that would "loom over residential communities." Our role "is not to weigh the evidence contained in the record or substitute [our] own conclusions for those of the fact finder," but rather "to determine whether there is substantial evidence in the record as a whole to support the challenged decision." *Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus,* 197 F.3d 64, 71 (3d Cir. 1999); *Omnipoint I,* 248 F.3d at 106. Many community residents objected after seeing the plans and Omnipoint's land planning expert conceded that the tower would be "taller than most I have seen" in a residential area. ZHB Decision, A 670. The ZHB and the MJ both found that the 110-foot flagpole would be a blight that would loom over the residential community. This finding was supported by substantial evidence.

privileging first entrants with antiquated technology over subsequent entrants who could promote consumer welfare by creating competition and offering superior services. We decline to address this question because a panel cannot overrule existing Third Circuit precedent. *See* 3d Cir. Internal Operating Proc. 9.1.

* * *

## Sur Rehearing

In Part II of the original opinion, we addressed Omnipoint's argument that the Township zoning ordinance has "the effect of prohibiting the provision of personal wireless services" in violation of the TCA. The issue before us on rehearing is the manner in which to determine the existence of a "significant gap." That is the portion of the original opinion that we have withdrawn and the issue we now consider.

Congress enacted the TCA to provide " 'a pro-competitive, de-regulatory national policy framework designed to rapidly accelerate private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition.' " *Penn Township,* 196 F.3d at 473 (citation omitted). The TCA preserves the authority of state and local government to regulate land use, but limits that authority with respect to personal wireless service facilities. *Id.* The TCA provides:

Preservation of local zoning authority

(A) General authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government . . . over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by

14

any State or local government or instrumentality thereof —

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) *shall not prohibit or have the effect of prohibiting the provision of personal wireless services.*

47 U.S.C. § 332(c)(7) (emphasis added).

In *Penn Township*, 196 F.3d 469, we considered the claims of APT, a wireless communications provider, which had been denied a zoning variance that it sought so that it could erect a communications tower and remedy a gap in coverage in its wireless service. APT claimed, *inter alia*, that the zoning ordinance was unconstitutional under Pennsylvania law and violated the TCA because it had the "effect of prohibiting the provision of personal wireless services" in the township. The township's ordinance did provide for communications towers in the township's light industrial districts but APT concluded that land in those districts was either not technologically feasible for it or unavailable. APT then argued that the ordinance was unconstitutionally exclusionary, an argument we rejected:

> The fact that the design APT has chosen for its system enables it to erect the tower that it wishes to build only on a relatively small portion of the land in the M Districts does not make Ordinance 109 exclusionary. Pennsylvania's rule against exclusionary zoning does not impose upon a township the duty to assure that all providers, regardless of the systems they have chosen to construct, will have a suitable site for a functioning tower within the township. To be exclusionary, the ordinance must effectively foreclose not only APT's use, but all use.

*Id.* at 477.

We also rejected APT's claim that the zoning ordinance had "the effect of prohibiting the provision of personal wireless services" in violation of the TCA. We explained that "[i]nterpreting the TCA's 'effect of prohibiting' clause to encompass every individual zoning denial simply because it has the effect of precluding a specific provider from

providing wireless services . . . would give the TCA preemptive effect well beyond what Congress intended." *Id.* at 478.

We recognized that there can be circumstances in which a provider would be able to "establish that an individual adverse zoning decision has the 'effect' of violating [the TCA]." *Id.* at 479. In that connection, we approvingly quoted the decision in *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630 (2d Cir. 1999), where that court concluded that the most compelling reading of the "effect of prohibiting" provision is that " 'local governments may not regulate personal wireless service facilities in such a way as to prohibit remote users from reaching such facilities. In other words, local governments must allow service providers to fill gaps in the ability of wireless telephones to have access to land-lines.' " *Penn Township*, 196 F.2d at 479 (quoting *Willoth*, 176 F.3d at 642-43).

We agreed with the *Willoth* court's recognition that the TCA preserved the regulatory authority of local zoning boards who may insist that service gaps be closed by the least intrusive means. *Id.* Furthermore, because "the focus is on the remote users' access to the national telephone network, the authority of the local board to deny applications is greater where the area which the provider applicant seeks to serve is already served by another provider." *Id.* at 479-80. Nonetheless, the Board's denial of an application is subject to the TCA provision prohibiting unreasonable discrimination among providers. *Id.*

In *Penn Township* we set forth what a provider must produce to show a violation of the TCA:

> [I]t is necessary for the provider to show more than that it was denied an opportunity to fill a gap in its service system. In order to show a violation of subsection 332(c)(7)(B)(i)(II) under *Willoth*, an unsuccessful provider applicant must show two things. First, the provider must show that its facility will fill an existing significant gap in the ability of remote users to access the national telephone network. In this context, the relevant gap, if any, is a gap in the service available to remote users. Not all gaps in a particular provider's

service will involve a gap in the service available to remote users. *The provider's showing on this issue will thus have to include evidence that the area the new facility will serve is not already served by another provider.*

Second, the provider applicant must also show that the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve. This will require a showing that a good faith effort has been made to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc.

*Id.* at 480 (emphasis added) (footnote omitted). We agreed with the *Willoth* court that the denial of a variance "will still be tempered" by subsection B(i)(I) of the TCA which prohibits unreasonable discrimination. *Id.* at 480 (quoting *Willoth*, 176 F.3d at 643).

Omnipoint has not shown that the Zoning Board's denial of a variance is the result of any unreasonable discrimination. Instead, it focuses most of its fire on the issue whether it showed a "significant gap" in service, a finding required by *Penn Township* before a disappointed applicant can successfully claim that the denial of the application has the effect of prohibiting the provision of personal wireless services. Omnipoint points to the testimony of its expert before the Zoning Board, Edmond Vea, that Omnipoint's wireless signal strength, as well as that of other wireless carriers, drops below negative 85 dBm in the area at issue and that when the signal is this low, wireless service drops below acceptable criteria and there is a probability that callers will lose their calls or will not be able to make a call. It also points to the testimony of another of its experts, Paul Dugan, who testified before the Magistrate Judge that a signal above negative 85 dBm is required to provide reliable service.

Dugan testified that, in conducting the tests on which Omnipoint relied, he linked eight cellular phones to a laptop computer and measured the signal strength and

performance of the eight cellular services in Easttown Township. A car was driven through the Township, the computer initiated calls and Dugan collected the data. Dugan concluded that a coverage hole exists for all licensees near Omnipoint's proposed communication facility because the carriers do not have sufficient signal strength or negative 85 dBm.

The Magistrate Judge found several flaws in Dugan's assessment. He explained that Dugan did not identify any regulatory standard requiring negative 85 dBm as the minimum signal strength, and that he did not establish a correlation between the negative 85 dBm standard and the actual ability of users to access the national telephone network. Rather, Dugan's own charts reflected that most of the calls were initiated successfully even when the signal strength was below negative 85 dBm. Although Dugan explained that he would expect to lose calls if he drove for an extended period of time, the Magistrate Judge noted that the burden is on Omnipoint to establish a significant gap.

The Magistrate Judge further found that Dugan's test results establish that there is reliable cellular service. Dugan testified that each of the eight phones made about 80 calls for a total of 640 calls. The seven service providers other than Omnipoint had 10 dropped calls and only one instance of no service. The Magistrate Judge calculated that of the 560 calls made using the other providers' services, only 11 or 1.96% experienced service problems. Omnipoint had 11 dropped calls and 13 instances of no service, or service problems 30% of the time. The Magistrate Judge concluded that only Omnipoint was incapable of providing reliable service to its customers and that the *Penn Township* test is not satisfied because " '[i]t is necessary for the provider to show more than that it was denied an opportunity to fill a gap in its service system.' " *Omnipoint Comm. Enter. v. Zoning Hearing Bd.*, 189 F. Supp. 2d 258, 265 (E.D. Pa. 2002) (quoting *Penn Township*, 196 F.3d at 480). The Magistrate Judge therefore concluded that where the drive test data does not support the expert opinion that weak signal strength results in unreliable wireless service, Omnipoint has not met its burden of establishing a significant gap in coverage.

Omnipoint argues in its reply brief that the Magistrate Judge erred in measuring the gap in service by evaluating the coverage of the seven other providers without including Omnipoint in its calculation. Omnipoint contends that under *Penn Township*, the Magistrate Judge should have looked at all of the providers in the aggregate, and if he had he would have determined that the call failure rate is approximately 5.4% instead of 1.96%, which is sufficient to establish a significant gap.[15] This is the principal point of difference between the majority and Judge Rosenn.

*Penn Township* requires a provider to show that "the area the new facility will serve is not already served by another provider." 196 F.3d at 480. Here, there are seven other cellular services provided in the area at issue. If we were to accept Omnipoint's argument, we would make *Penn Township*'s requirement meaningless.

This conclusion is consistent with our earlier opinion in *Nextel West Corp. v. Unity Township*, 282 F.3d 257 (3d Cir. 2002), where Nextel claimed that the zoning ordinance of the defendant township had the effect of prohibiting communications towers in violation of the TCA.[16] We reaffirmed the *Penn Township* test and explained that the first prong (that the provider must show that its facility will fill an existing significant gap in the service available to remote users) requires "a gap from a *user's* perspective, rather than a *particular provider's* perspective." *Nextel West*, 282 F.3d at 265. We explained: "[t]hus, this prong focuses on whether any provider is covering the gap, instead of whether the gap exists only in, for example, Nextel's service. A provider must 'include evidence that the area the new facility will serve is not already served by another provider.'" *Id.* (quoting *Penn Township*, 196 F.3d at 480). We remanded so that the district court could determine whether a gap "existed for all or for Nextel alone." *Id.* at 266.

---

15. As a general matter, courts of appeals will not consider arguments raised on appeal for the first time in a reply brief. *United States v. Boggi*, 74 F.3d 470, 478 (3d Cir. 1996). Even if this argument were properly before us, it is not persuasive for the reasons set forth in the text.

16. The district court held that the case was moot but we reversed and remanded for an adjudication on the merits. *Id.* at 259.

It is therefore clear that not only our opinion in *Penn Township* but also our opinion in *Nextel West* reject Omnipoint's argument that the existence of a significant gap must include the data from the applicant provider.

Omnipoint argues that our holding will promote monopolization and conflict with the pro-competitive objectives of the TCA (adopting Judge Rosenn's view expressed in the original panel opinion). But nothing we say here suggests that the Zoning Board can deny all applications after the first. The issue was considered in *Nextel West* where we explained that the "effectively prohibit" and "unreasonably discriminate" provisions of the TCA work together to promote the expansion of wireless telecommunications networks. *Id.* at 264 n.6. We stated,

> The first provision (forbidding ordinances which effectively prohibit wireless facilities) aims to open up municipalities to wireless providers generally. The second provision (against unreasonable discrimination) seeks to ensure that, once the municipality allows the first wireless provider to enter, the municipality will not unreasonably exclude subsequent providers who similarly wish to enter and create a competitive market in telecommunications services.

*Id.* The area at issue in this case is already served by seven other providers so there is no basis for concern about monopolization.

Finally, in its Answer to the Petition for Rehearing, Omnipoint suggests that if we find that our decision in *Penn Township* would direct a decision contrary to that which it seeks, we should seek en banc review and explicitly overrule our *Penn Township* decision. Judge Rosenn has already explained that we are bound by our earlier opinions. Moreover, as we have just noted, it is not only *Penn Township*, but also *Nextel West* that informs our decision. Even if we were free to reconsider our earlier decisions, we would not change them.[17] We do not read

---

17. It is of some interest that the decision in *Second Generation Props. v. Town of Pelham*, 313 F.3d 620 (1st Cir. 2002), on which the dissent relies, expressed its disagreement with the decision in *Penn Township* and, as does the dissent, looked to qualitative aspects of competitive service to show a significant gap. However, Omnipoint did not produce evidence of qualitative shortcomings, if any, in the competitive service, and limited itself to evidence as to the quantity of calls.

those decisions to authorize the township zoning boards to deny any application once the area is already served by another provider, which is Omnipoint's restatement of the holding. Instead, we merely hold that a fact-finder determining the existence of a significant gap should examine whether other providers already serve the area. The fact that one applicant may have coverage problems is not determinative of whether there is a significant gap.

We conclude that the Magistrate Judge properly applied *Penn Township* and did not err in rejecting Omnipoint's argument that the Township zoning ordinance has "the effect of prohibiting the provision of personal wireless services" in violation of the TCA.

## VII.

Accordingly, we will affirm the order of the Magistrate Judge.

Rosenn, Circuit Judge, dissenting:

I believe that the majority decision in this case thwarts the policies and purposes of the Federal Telecommunications Act of 1996 (TCA). I fear that it will impede the inevitable progress of personal wireless services. I am, therefore, constrained to dissent.

As the majority points out, Congress had two sets of priorities in enacting the amended Telecommunications Act in 1996.[1] Congress sought to create a "pro-competitive, de-regulatory national policy framework designed to rapidly accelerate private sector deployment of advanced telecommunication and information technologies and services to all Americans by opening all telecommunications markets to competition." H.R. Conf. Rep. No. 104-458, at 113 (1996), reprinted in 1996 U.S.C.C.A.N. 124. At the same time, Congress attempted to balance this goal against the legitimate concerns of state and local governments in regulating the siting of wireless facilities. H.R. Conf. Rep. No. 104-204, at 94-95 (1995), reprinted in 1996 U.S.C.C.A.N. 61.

With respect to personal wireless service facilities, Congress limited state and local zoning authority to some degree. When regulating the placement, construction, and modification of personal wireless service facilities, state and local governments: (I) shall not unreasonably discriminate among providers of functionally equivalent services; and (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services. 47 U.S.C. § 332(c)(7)(B)(i). The scope of the latter limitation, known as the "prohibition of service" clause, is the genesis of the difference of opinion here.

We have previously considered the scope of the prohibition of service clause. *APT Pittsburgh Ltd. P'ship v.*

---

1. Our disagreement today is precipitated in part by the notoriously opaque wording of the TCA. *See AT & T v. Iowa Utils. Bd.*, 525 U.S. 366, 397 (1999) ("It would be a gross understatement to say that the Telecommunications Act of 1996 is not a model of clarity. It is in many important respects a model of ambiguity or indeed even self-contradiction."). In light of this ambiguity, we look to congressional history and subsequent caselaw to guide us.

*Penn Township, Butler County*, 196 F.3d 469 (3d Cir. 1999), established a test to determine if the decision of a local zoning authority has "the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). A service provider must first "show that its facility will fill an existing significant gap in the ability of remote users to access the national telephone network." *Penn Township*, 196 F.3d at 480.[2] The question is what services are available to the remote users of all service providers in the specific area where the challenging provider asserts that there is a significant gap. A gap is a gap in the service offered to remote wireless users by the existing providers.

There is no dispute that the gap must be from the users' perspective, rather than from a particular provider's perspective. *See Nextel W. Corp. v. Unity Township*, 282 F.3d 257, 265 (3d Cir. 2002). Omnipoint cannot simply point to the gap in the service it provides to establish a prohibition of service claim under 47 U.S.C. § 332(c)(7)(B)(i)(II). It must show that the telecommunications needs of users in the community as a whole are not being adequately served.

In my view, the proper test for determining whether there is a significant gap is to look at all wireless telephone users, including the plaintiff's customers. Instead, the Magistrate Judge (MJ) looked only at non-Omnipoint users and found that non-Omnipoint users experienced problems only 1.96% of the time in Easttown Township. *See* 189 F. Supp. 2d at 265. Based on this finding, the MJ concluded that Omnipoint had failed to carry its burden of proving a significant gap. I believe that the relevant figure in the *Penn Township* analysis is the aggregate, including Omnipoint users and including calls outside Easttown Township, but within each provider's Wireless Communication Facility's coverage area. Under this standard, the MJ's 1.96% figure understates the actual call failure rate. Omnipoint places the number at approximately 5.5%. If this figure is correct,

---

2. In the second prong of the prohibition of service test, the provider challenging the zoning decision must also show that its proposal was the least intrusive on the values the denial sought to serve. *See Penn Township*, 196 F.3d 480.

Omnipoint may be able to carry its burden of showing a significant gap in service. *Cf. Cellular Tel. Co. v. Zoning Bd. of Adjustment of Harrington Park*, 90 F. Supp. 2d 557, 565 (D. N.J. 2000) (holding that a call failure rate of five to seven percent is a significant gap).[3]

The difference between the majority and me hinges on what it means to establish a significant gap from the users' perspective. In my view, the relevant figure to be analyzed in determining whether there is a significant gap is the aggregate of *all the existing remote users*. Since Omnipoint users are not newcomers, they deserve consideration.[4] The test I propose is to look at all wireless telephone users, giving existing Omnipoint users no more and no less consideration than the others. The MJ instead looked only at non-Omnipoint users and concluded that Omnipoint had failed to carry its burden of proving a significant gap. In my view, this approach was flawed because it failed to give any consideration whatsoever to existing Omnipoint users.[5] A

3. I agree with the majority that Omnipoint's other evidence to demonstrate a significant gap is not persuasive. Maj. Op. at 16-17. The MJ held that Omnipoint's expert witness Dugan had failed to establish a correlation between the negative 85 dBm standard and users' actual ability to access the national telephone network. Dugan's own tests revealed that cell phone users in the area below negative 85 dBm nevertheless were able to make and receive calls using non-Omnipoint networks. *See* 189 F. Supp. 2d at 264. I agree with the MJ's finding that Omnipoint did not carry its burden of showing that a signal strength of less than negative 85 dBm alone proves a significant gap. Dugan argued that the active portion of one of the tests that he conducted understates the problem with the services' reliability in that area. Omnipoint was responsible for correcting this proof problem by more closely replicating actual driving habits and equipment. *See* 189 F. Supp. 2d at 264 n.4.

4. Omnipoint already had an existing license in Easttown Township and an existing facility in the business district. This is not a case where a newcomer seeks to have its *potential* customers calculated as existing users. On the contrary, Omnipoint is a provider that seeks to expand its service to existing customers by remedying a significant gap in the southern area of Easttown Township.

5. I would reach this question even though Omnipoint raised this argument for the first time in its Reply Brief. Generally, we do not consider arguments raised for the first time in a Reply Brief, but we do

court should look at the record from the perspective of the users, not the providers. A customer who has an existing contract with Omnipoint, who lives in Easttown (or regularly commutes through the township), and who gets reception in 2/3 of Easttown but wants to get reception in the other 1/3 of Easttown logically should be calculated as an existing customer for the purpose of evaluating whether there is a significant gap.

The majority seems to suggest that these users should only be taken into account if there is no service to which they could switch that would give them service in the 1/3 of the township Omnipoint service does not reach. In my opinion, this is an overly restrictive view of existing users, especially because industry practice often requires contracts for service for a certain term, thereby significantly increasing the costs of switching. Additionally, hypothetical Omnipoint users who were not counted in these calculations might be forced by this rule to switch to a provider that did not give them comparable services. By contrast, Omnipoint or another similar digital provider could transmit text, emails, and photographs; a cellular

---

have the discretion to do so in exceptional circumstances. *See Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 204-05 n.29 (3d. Cir. 1990). Here, because I believe the MJ erred in ignoring Omnipoint users in ascertaining whether there was a significant gap in the Township, I would consider Omnipoint's argument to avoid a miscarriage of justice. *Cf. Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1571 (1st Cir. 1994) (Courts of Appeals may consider arguments raised for the first time in a Reply Brief if the arguments are "so compelling as virtually to insure the appellant's success" or if the arguments "must be ruled on to avoid a miscarriage of justice"); *see also Dufrene v. Browning-Ferris, Inc.*, 207 F.3d 264, 268 (5th Cir. 2000) (Courts of Appeals may review for plain error, where the error is "clear" or "obvious" and affects "substantial rights."); *United States v. Wilson*, 962 F.2d 621, 627 (7th Cir. 1992) (Courts of Appeals may consider an argument raised for the first time in a Reply Brief when an issue is serious and was overlooked by all concerned). In this case, the forfeited argument affects the fairness, integrity, and public reputation of the judicial proceedings. *Cf. Dufrene*, 207 F.3d at 268. On remand, I would give Easttown Township adequate opportunity to respond to the factual question of whether Omnipoint can show a significant gap under the correct legal standard.

provider can only transmit voice. Thus, denying Omnipoint users consideration in determining whether there is a significant gap is a harsh and regressive result, one that I do not believe Congress envisioned.

As the First Circuit Court of Appeals explained in *Second Generation Props. v. Town of Pelham*, 313 F.3d 620 (1st Cir. 2002):

> Such a rule . . . does not further the interests of the individual consumer. . . . [I]t is of little comfort to the customer who uses AT&T Wireless . . . who cannot get service along the significant geographic gap . . . that a Cingular Wireless customer does get some service in that gap. Of course, that AT&T customer could switch to Cingular Wireless. But were the rule adopted, the same customer might well find that she has a significant gap in coverage a few towns over, where AT&T Wireless, her former provider, offers service but Cingular Wireless does not. The result would be a crazy patchwork quilt of intermittent coverage. That quilt might have the effect of driving the industry toward a single carrier. When Congress enacted legislation to promote the construction of a nationwide cellular network, such a consequence was not, we think, the intended result. . . .

*Id.* at 633-34.

I also differ from the majority as to the meaning of a key statement in *Penn Township*, which states that proof of a relevant gap in service requires a provider "to include evidence that the area the new facility will serve is not already served by another provider." *Penn Township*, 196 F.3d at 480. The difficulty is how to interpret this statement in light of the preceding inconsistent statement that "the provider must show that its facility will fill an existing significant gap in the ability of remote users to access the national telephone network." *Id.* In other words, what happens when one provider already provides a service in part of a township, but many of the township's existing resident users are unable to access the national network in that part of the township? In this case, there is a significant gap in an area of the township when all existing users are

taken into account. However, a challenging provider cannot show that "the area the new facility will serve is not already served by another provider," even though the other provider has inferior functional services.[6]

The majority's interpretation of *Penn Township* is at odds with *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630 (2d Cir. 1999), a case *Penn Township* referred to as "the most thoughtful discussion" of the prohibition of service clause. *Penn Township*, 196 F.3d at 479. The *Willoth* court described as "untenable" the proposition that "once personal wireless servers are available somewhere within the jurisdiction of a state or local government . . . the state or local government could deny any further application with impunity." *Willoth*, 176 F.3d at 641.

There is, therefore, tension *within Penn Township* over what to do with a circumstance in which one user serves part of a township and other existing providers seek to extend their services to that part of the township. On the one hand, *Penn Township* states without qualification that proof of a relevant gap in service requires a provider to include evidence that the area the new facility will serve is not already served by another provider. On the other hand, *Penn Township* refers us to the *Willoth* opinion which states that it is untenable to think that once personal wireless servers are available somewhere within a township, the state or local government could deny any further applications with impunity. The only way to resolve this tension within *Penn Township* that is consistent with congressional intent is to say that the challenger must show that there is a "significant gap" in that part of the township. If there is a significant gap, then the area the new facility will serve is not already adequately served by another provider. *Cf. Willoth*, 176 F.3d at 643 (". . . once an area is *sufficiently* serviced by a wireless service provider, the right to deny applications becomes broader . . .")

---

6. I am also concerned that today's interpretation of the prohibition of service clause could be applied in other cases in a way that would create a monopoly and hinder Congress' goal of establishing a pro-competitive, de-regulatory national policy framework that opens all telecommunications markets to competition.

(emphasis added); *Second Generation*, 313 F.3d at 633 n.13 ("[*Willoth*'s] stress on adequate coverage should logically mean that the circuit would oppose an 'any coverage equals no gap' rule").

In my view, *Penn Township* did not intend to foreclose proof of a significant gap in service because of the mere presence of one or more telecommunication providers in the jurisdiction.[7] *Penn Township* must be read to mean providers with equal technological services.[8] I believe my approach is also consistent with the approach taken in *Second Generation* by the First Circuit Court of Appeals, the only other circuit to address this question. In a cogently argued opinion, the *Second Generation* court rejected the rule the majority adopts today, i.e., that coverage by any provider precludes all statutory prohibition of service claims. *See Second Generation*, 313 F.3d at 632-635. Moreover, *Second Generation* convincingly interprets *Willoth* to reject the majority's rule as well. *See id.* at 632-33 n.13.

The majority points out that in this case there are seven other cellular providers in Easttown Township. *See* Maj. Op. at 18. However, the number of service providers already in an area is less important in determining whether there is a gap than the percentage of existing users who cannot connect with the national network. The real question is

7. It should be noted that the *Penn Township* opinion did not have a developed record that necessitated clarification of these questions of proof.

8. We have previously addressed the question of functional equivalence in the context of the unreasonable discrimination prong of 47 U.S.C. § 332(c)(7)(B)(i). In *Nextel*, we explained that "[w]e think the equivalency of function relates to the telecommunications services the entity provides, not to the technical particularities (design, technology, or frequency) of its operations. The TCA clearly does not force competing wireless providers to adopt identical technology or design nor does it compel them to fit their networks of antennae into a uniform, rigid honeycomb of interlocking cells. Indeed, the FCC's assignment of a different frequency and signal strength to each licensee renders such uniformity impossible." *Nextel*, 282 F.3d at 266-67 n.13. Digital phones can transmit voice, email, text, and photographs. Cellular phones can only transmit voice. In my view, this distinction goes beyond "technical particularities." Rather, it is a functional distinction.

whether there is a gap from the users' perspective because of the providers' limitations of the existing technological facilities. *See Nextel*, 282 F.3d at 265. In this case, it does not matter how many competitors Omnipoint had. What matters is that a significant percentage of all existing users are unable to access the national network because of the shortcomings of the existing providers' facilities.

The majority approach today threatens Congress' goal of promoting the rapid acceleration of private sector deployment of advanced telecommunication and information technologies to all Americans. The existence of older, less functional cellular networks should not be permitted to impede the development of new, digital technologies like PCS and undermine competition in the telecommunications industry. The majority opinion will effectively impede the development of new digital technologies that have a more limited range but superior capabilities.[9]

---

9. Imagine the following hypothetical scenario. In a certain township, there are four providers of wireless service. Each provider has 100 existing users, for a total of 400 users. In the southern part of the township, Providers B, C, and D have adequate *cellular* service because their towers in the center of the township have broader service areas. Provider A also has a tower in the center of the township, but it is digital, and therefore extends less far but provides more advanced capabilities such as text messaging, digital transmission of photos, and email. Provider A's customers get service in three-quarters of the township (and elsewhere across the country).

The question is whether there is a significant gap in the southern part of the township. Of the 400 existing wireless customers in the township, 100 of them cannot get service and 300 can. Under the majority's approach, the calculation only includes those 300 and there is no significant gap. Also, the majority holds that Provider A and/or its customers could not bring a prohibition of service claim even if there were a significant gap, because Providers B, C, and D already provide service, although not of equal function.

Under my view, in contrast, the calculation includes all 400 users and therefore there is a significant gap in the southern part of the township because 25% of existing users in the township cannot access the network. In my opinion, Provider A and/or its customers can show a significant gap and assert a prohibition claim.

I, therefore, respectfully dissent from the sur rehearing portion of today's opinion.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*

---

Now imagine that because digital/PCS service is more advanced and popular, Provider A earns 10,000 new customers and the other three do not earn any additional customers because their technology is antiquated. I submit that under this scenario, the majority's holding today would undermine clear congressional policy.